

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 1 2 2007

JAMES N. HATTEN, Clerk
By _____
Deputy Clerk

SEARS, ROEBUCK & CO., SEARS
HOLDINGS CORPORATION, KMART
CORPORATION AND LANDS' END,
INC.,

       Plaintiffs,

    v.

MARSH & McLENNAN COMPANIES,
INC.; MARSH INC.; MARSH GLOBAL
BROKING INC.; AON CORPORATION;
AMERICAN INTERNATIONAL
GROUP, INC.; ILLINOIS NATIONAL
INSURANCE CO.; LEXINGTON
INSURANCE COMPANY; NATIONAL
UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA; ACE
AMERICAN INSURANCE COMPANY;
ACE BERMUDA INSURANCE LTD.;
CHUBB & SON, INC.; CHUBB
ATLANTIC INDEMNITY, LTD.; CNA
FINANCIAL CORPORATION;
CONTINENTAL CASUALTY
COMPANY; THE HARTFORD
FINANCIAL SERVICES GROUP, INC.;
TWIN CITY FIRE INSURANCE
COMPANY; THE TRAVELERS
COMPANIES, INC.; TRAVELERS
CASUALTY & SURETY COMPANY OF
AMERICA; GULF INSURANCE
COMPANY; TRAVELERS PROPERTY
CASUALTY INSURANCE COMPANY;
ST. PAUL FIRE & MARINE

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

TCB

No.

**1:07-CV-2535**

**JURY TRIAL DEMANDED**

INSURANCE COMPANY; XL                    )
INSURANCE (BERMUDA) LTD; XL              )
AMERICA, INC.; XL INSURANCE              )
AMERICA, INC.; XL SPECIALTY             )
INSURANCE COMPANY; LIBERTY              )
MUTUAL INSURANCE CO.; LIBERTY           )
MUTUAL GROUP; AMERICAN                  )
ALTERNATIVE INSURANCE                   )
CORPORATION; ARCH CAPITAL               )
GROUP (U.S.) INC.; ARCH CAPITAL         )
GROUP LTD.; ARCH REINSURANCE            )
LTD.; ENDURANCE SPECIALTY               )
INSURANCE LTD.; HCC INSURANCE           )
HOLDINGS, INC.; LIBERTY                  )
INSURANCE UNDERWRITERS INC.;            )
ROYAL & SUN ALLIANCE                    )
INSURANCE PLC; ROYAL &                  )
SUNALLIANCE INSURANCE                   )
AGENCY, INC.; THE MARINE                )
INSURANCE COMPANY LIMITED;              )
FACTORY MUTUAL INSURANCE                )
COMPANY; MAX RE LTD.; ALLIANZ           )
SE; FAIRFAX FINANCIAL HOLDINGS          )
LIMITED; FEDERAL INSURANCE              )
COMPANY; GREAT AMERICAN                 )
ALLIANCE INSURANCE COMPANY;             )
AMERICAN INTERNATIONAL                  )
COMPANIES; GREAT AMERICAN               )
PROPERTY CASUALTY INSURANCE             )
GROUP; AND WESTCHESTER                  )
SURPLUS LINES INSURANCE                 )
COMPANY,                                )
                                        )
                    Defendants.         )

# COMPLAINT

Plaintiffs Sears, Roebuck  Co., Sears Holdings Corporation, Kmart Corporation and Lands' End, Inc. ("Lands' End") (collectively, "Sears" or "Plaintiffs"), by and through their attorneys, complain against Defendants Marsh & McLennan Companies, Inc., Marsh Inc., Aon Corporation, American International Group Inc., Illinois National Insurance Co., Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, ACE American Insurance Company, ACE Bermuda Insurance, Ltd, Chubb & Son, Inc., Chubb Atlantic Indemnity, Ltd., CNA Financial Corporation, Continental Casualty Company, The Hartford Financial Services Group, Inc., Twin City Fire Insurance Company, The Travelers Companies, Inc., Travelers Casualty & Surety Company of America, Gulf Insurance Company, Travelers Property Casualty Insurance Company, St. Paul Fire & Marine Insurance Company, XL Insurance (Bermuda) Ltd, XL America, Inc., XL Insurance America, Inc., XL Specialty Insurance Company, Liberty Mutual Insurance Co., Liberty Mutual Group, American Alternative Insurance Corporation, Arch Capital Group (U.S.) Inc., Arch Capital Group Ltd., Arch Reinsurance Ltd., Endurance Specialty Insurance Ltd., HCC Insurance Holdings Inc., Liberty Insurance Underwriters Inc., Royal & Sun Alliance Insurance plc, Royal & Sunalliance Insurance Agency, Inc., The Marine

Insurance Company Limited, Factory Mutual Insurance Company, Max Re Ltd.,

Allianz SE, Fairfax Financial Holdings Limited, Federal Insurance Company, Great

American Alliance Insurance Company, American International Companies, Great

American Property Casualty Insurance Group, and Westchester Surplus Lines

Insurance Company as follows:

## NATURE OF ACTION

1.      This is an action by Plaintiffs, corporate insureds, against

Defendants, Plaintiffs' insurance brokers and the named insurers, for actual, treble,

and punitive damages, disgorgement, restitution, other injunctive and equitable

relief, and attorneys' fees and costs for Defendants' (1) violations of Section 1 of

the Sherman Act, (2) violations of Section 1962(c) & (d) of RICO, (3) breach of

fiduciary duty, (4) inducement to breach fiduciary duty, (5) breach of contract, (6)

tortious interference with contract, (7) unjust enrichment, (8) common law fraud,

(9) aiding and abetting common law fraud, (10) statutory and consumer fraud, and

(11) violation of state antitrust laws.

2.      The conduct forming the basis of this complaint involves the

Defendants' use of a variety of illegal schemes and practices designed to, among

other things, allocate customers, steer business, and rig bids for insurance products,

and raise the prices of insurance products paid by Plaintiffs for insurance products

(collectively the "Illegal Scheme"). In addition, the Broker Defendants (as defined herein) steered policyholders' business to preferred Insurer Defendants (as defined herein). The Broker Defendants engaged in this practice because the Insurer Defendants paid substantial kickbacks to steer business to preferred insurers or refrain from moving the policyholders' business to other insurers. Plaintiffs, however, did not authorize the Broker Defendants to enter into such agreements, in which competition for insurance products was suppressed by a conspiracy to eliminate competition in bids for the sale of insurance products. The Broker Defendants knew this and therefore took steps to preserve the secrecy of these illegal schemes and practices.

3.     Competition for policyholders' business did not occur, and policyholders, including Plaintiffs, paid more for insurance products or received less beneficial terms than the competitive, non-rigged market would have provided. A recent government investigation of the illicit agreements and conduct alleged herein, and subsequent and on-going criminal proceedings has led to a number of guilty pleas in response to criminal charges against the employees of the Defendants. Moreover, several more employees of the Defendants are currently under indictment in the same criminal investigation.

**PARTIES**

4.     Plaintiff Sears, Roebuck and Co. ("Sears, Roebuck") is a New York corporation with its principal place of business in Illinois, and is registered with the Georgia Secretary of State to transact business as a foreign corporation in the State of Georgia.

5.     Plaintiff Sears Holdings Corporation ("Sears Holdings") is a Delaware corporation with its principal place of business in Illinois, and is registered with the Georgia Secretary of State to transact business as a foreign corporation in the State of Georgia.

6.     Plaintiff Kmart Corporation ("Kmart") is a Michigan corporation with its principal place of business in Michigan, and is registered with the Georgia Secretary of State to transact business as a foreign corporation in the State of Georgia.

7.     Plaintiff Lands' End, Inc. ("Lands' End") is a Delaware corporation with its principal place of business in Wisconsin, and is registered with the Georgia Secretary of State to transact business as a foreign corporation in the State of Georgia.

8.    On information and belief, Defendant Marsh & McLennan Companies, Inc. ("MMC") is a Delaware corporation with its principal place of business in New York.

9.    On information and belief, Defendant Marsh Inc. ("Marsh Inc.") is a Delaware corporation with its principal place of business in New York.  On information and belief, Marsh Inc. is a wholly-owned subsidiary of MMC.

10.    On information and belief, Defendant Marsh Global Broking Inc. ("Global Broking") d/b/a Marsh Placement Inc. is a subsidiary of MMC, an Illinois Corporation, with its principal place of business in New York.  (Global Broking, Marsh Inc. and MMC are collectively referred to here as "Marsh.")

11.    On information and belief, Defendant Aon Corporation ("Aon") is a Delaware corporation with its principal place of business in Illinois.

12.    On information and belief, Defendant American International Group, Inc. ("AIG") is a Delaware Corporation with its principal place of business in New York.

13.    On information and belief, Defendant Illinois National Insurance Co. ("Illinois National") is a subsidiary of AIG, an Illinois Corporation, with its principal place of business in Illinois.

14.     On information and belief, Defendant Lexington Insurance Company ("Lexington") is a subsidiary of AIG, and is also partly owned by National Union Fire Insurance Company of Pittsburgh, PA, The Insurance Company of the State of Pennsylvania and Birmingham Fire Insurance Company of Pennsylvania, which are all subsidiaries of AIG.  Lexington is incorporated under the laws of Delaware with its principal place of business in Massachusetts.

15.     On information and belief, Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union Pittsburgh") is a subsidiary of AIG, and is incorporated under the laws of Pennsylvania with its principal place of business in New York.

16.     On information and belief, Defendant ACE American Insurance Company ("ACE American") is a subsidiary of ACE Limited, and is incorporated under the laws of Pennsylvania, with its principal place of business in Pennsylvania.

17.     On information and belief, Defendant ACE Bermuda Insurance Limited ("ACE Bermuda") is a subsidiary of ACE Limited, a Bermuda Corporation, with its principal place of business in Bermuda.  At all times pertinent to this complaint, ACE Bermuda transacted business in this District by, including

but not limited to, providing general, property casualty, life and excess insurance products.

18.    On information and belief, Defendant Chubb & Son, Inc. ("Chubb & Son") is a division of Federal Insurance Company, which is a subsidiary of The Chubb Corporation, and is incorporated under the laws of Indiana, with its principal place of business in New Jersey.

19.    On information and belief, Defendant Chubb Atlantic Indemnity, Ltd. ("Chubb Atlantic") is a subsidiary of The Chubb Corporation, a Bermuda Corporation, with its principal place of business in Bermuda.

20.    On information and belief, Defendant CNA Financial Corporation ("CNA") is incorporated under the laws of Delaware, with its principal place of business in Illinois.

21.    On information and belief, Defendant Continental Casualty Company ("Continental Casualty") is a subsidiary of CNA, an Illinois Corporation, with its principal place of business in Illinois.

22.    On information and belief, Defendant The Hartford Financial Services Group, Inc. ("Hartford") is incorporated under the laws of Delaware, with its principal place of business in Connecticut.

23.    On information and belief, Defendant Twin City Fire Insurance Company ("Twin City") is a subsidiary of Hartford, and is incorporated under the laws of Indiana with its principal place of business in Connecticut.

24.    On information and belief, Defendant The Travelers Companies, Inc. ("Travelers") is incorporated under the laws of Minnesota, with its principal place of business in Minnesota.

25.    On information and belief, Defendant Travelers Casualty & Surety Company of America ("Travelers Casualty") is a subsidiary of Travelers, and is incorporated under the laws of Connecticut, with its principal place of business in Connecticut.

26.    On information and belief, Defendant Gulf Insurance Company ("Gulf Insurance") is a subsidiary of Travelers, and is incorporated under the laws of Connecticut, with its principal place of business in New York.

27.    On information and belief, Defendant Travelers Property Casualty Insurance Company ("Travelers Property Casualty") is a subsidiary of Travelers, and is incorporated under the laws of Connecticut, with its principal place of business in Connecticut.

28.　　On information and belief, Defendant St. Paul Fire & Marine Insurance Company ("St. Paul F & M") is a subsidiary of Travelers, incorporated under the laws of Minnesota, with its principal place of business in Minnesota.

29.　　On information and belief, Defendant XL Insurance (Bermuda) Ltd ("XL Bermuda") is a subsidiary of XL Capital Ltd, and is incorporated under the laws of Bermuda, with its principal place of business in Bermuda.

30.　　On information and belief, Defendant XL America, Inc. is a subsidiary of XL Capital Ltd, and is incorporated under the laws of Delaware, with its principal place of business in Connecticut.

31.　　On information and belief, Defendant XL Insurance America, Inc. ("XL Insurance America") is a subsidiary of XL Capital Ltd, and is incorporated under the laws of Delaware, with its principal place of business in Connecticut.

32.　　On information and belief, Defendant XL Specialty Insurance Company ("XL Specialty") is a subsidiary of XL Capital Ltd, and is incorporated under the laws of Delaware, with its principal place of business in Connecticut.

33.　　On information and belief, Defendant Liberty Mutual Insurance Co. ("Liberty Mutual Insurance") is a subsidiary of Liberty Mutual Holding

Company, Inc., and is incorporated under the laws of Massachusetts, with its principal place of business in Massachusetts.

34.   On information and belief, Defendant Liberty Mutual Group ("Liberty Group") is incorporated under the laws of New Jersey, with its principal place of business in Massachusetts.

35.   On information and belief, Defendant American Alternative Insurance Corporation ("American Alternative") is a subsidiary of Munich Re American Corporation, and is incorporated under the laws of Delaware, with its principal place of business in New Jersey.

36.   On information and belief, Defendant Arch Capital Group Ltd. ("Arch") and is incorporated under the laws of Bermuda, with its principal place of business in Bermuda.  At all times pertinent to this complaint, Arch Capital Group Ltd. transacted business in this District by, including but not limited to, providing general, property, casualty, life and excess insurance products.

37.   On information and belief, Defendant Arch Capital Group (U.S.) Inc. ("Arch US") is a subsidiary of Arch, and is incorporated under the laws of Delaware, with its principal place of business in New York.

38.   On information and belief, Defendant Arch Reinsurance Ltd. ("Arch Bermuda") is a subsidiary of Arch Capital Group Ltd., and is incorporated

under the laws of Bermuda, with its principal place of business in Bermuda. At all times pertinent to this complaint, Arch Reinsurance Ltd. transacted business in this District by, including but not limited to, providing general, property, casualty, life and excess insurance products.

39.    On information and belief, Defendant Endurance Specialty Insurance Ltd. ("Endurance Specialty") is a subsidiary of Endurance Specialty Holdings Ltd., and is incorporated under the laws of Bermuda, with its principal place of business in Bermuda.

40.    On information and belief, Defendant HCC Insurance Holdings, Inc. ("HCC Insurance Holdings") is incorporated under the laws of Delaware, with its principal place of business in Texas.

41.    On information and belief, Defendant Liberty Insurance Underwriters Inc. ("Liberty Insurance") is a subsidiary of Liberty Mutual Holding Company, Inc., and is incorporated under the laws of New York, with its principal place of business in New York.

42.    On information and belief, Defendant Royal & Sun Alliance Insurance plc ("Royal & Sun Alliance") is a subsidiary of Royal & Sun Alliance Insurance Group plc, and is incorporated under the laws of the United Kingdom, with its principal place of business in the United Kingdom. At all times pertinent to

this complaint, Royal & Sun Alliance transacted business in this District by, including but not limited to, providing general, property casualty, life and excess insurance products.

43.    On information and belief, Defendant Royal & SunAlliance Insurance Agency, Inc. ("Royal & Sun") is a subsidiary of Royal & Sun Alliance Insurance Group plc, and is incorporated under the laws of Delaware, with its principal place of business in New York. At all times pertinent to this complaint, Royal & Sun transacted business in this District by, including but not limited to, providing general, property, casualty, life and excess insurance products.

44.    On information and belief, Defendant The Marine Insurance Company Limited ("Marine Insurance") is a subsidiary of Royal & Sun Alliance Insurance Group plc, and is incorporated under the laws of the United Kingdom, with its principal place of business in England. At all times pertinent to this complaint, Marine Insurance transacted business in this District by, including but not limited to, providing general, property casualty, life and excess insurance products.

45.    On information and belief, Defendant Factory Mutual Insurance Company ("Factory Mutual") d/b/a FM Global is incorporated under the laws of Rhode Island, with its principal place of business in Massachusetts.

46.    On information and belief, Defendant Max Re Ltd. ("Max Re") is a subsidiary of Max Re Capital Ltd., and is incorporated under the laws of Bermuda, with its principal place of business in Bermuda.  At all times pertinent to this complaint, Max Re Ltd. transacted business in this District by, including but not limited to, providing general, property, casualty, life and excess insurance products.

47.    On information and belief, Defendant Allianz SE ("the Allianz Group") is incorporated under the laws of Germany, with its principal place of business in Germany.

48.    On information and belief, Defendant Fairfax Financial Holdings Limited ("Fairfax") is domiciled in Canada, with its principal place of business in Ontario, Canada.

49.    On information and belief, Defendant Federal Insurance Company ("Federal") is a subsidiary of The Chubb Corporation, and is incorporated under the laws of Indiana, with its principal place of business in New Jersey.

50.    On information and belief, Defendant Great American Alliance Insurance Company ("Great American") is a subsidiary of American Financial

Group, Inc., and is incorporated under the laws of Ohio, with its principal place of business in Ohio.

51.    On information and belief, Defendant American International Companies ("American International") is a subsidiary of AIG, and is incorporated under the laws of Bermuda, with its principal place of business in Bermuda.

52.    On information and belief, Defendant Great American Property Casualty Insurance Group ("Great American Property") is a subsidiary of American Financial Group, Inc., and is incorporated under the laws of Ohio, with its principal place of business in Ohio.

53.    On information and belief, Defendant Westchester Surplus Lines Insurance Company ("Westchester") is a subsidiary of ACE Limited and is incorporated under the laws of Georgia, with its principal place of business in Georgia.

## JURISDICTION AND VENUE

54.    The Northern District of Georgia has subject-matter jurisdiction under, *inter alia*, 28 U.S.C. §§ 1331 and 1337, and this Court has jurisdiction for pretrial proceedings under 28 U.S.C. § 1407(a).

55.    The Northern District of Georgia has personal jurisdiction over each Defendant as each Defendant transacted business in the Northern District of

Georgia by, among other things, providing insurance brokerage services or general, property, casualty, life, excess, and a variety of other insurance products as defined herein. This Court has personal jurisdiction for pretrial proceedings under 28 U.S.C. § 1407(a).

56.    The Northern District of Georgia is the proper venue pursuant to Sections 4, 12 and 16 of the Clayton Act; 15 U.S.C. §§ 15, 22 and 26; 18 U.S.C. § 1965(a); 28 U.S.C. § 1391(b), (c) and (d); and 28 U.S.C. § 1407(a), because Defendants reside, transacted business, were or had agents in the Northern District of Georgia, and because a substantial portion of the affected interstate trade and commerce described herein, is and has been carried out in the Northern District of Georgia. This Court is the venue for pretrial proceedings under 28 U.S.C. § 1407(a). Plaintiffs note, however, that a multi district litigation *In Re Insurance Brokerage Litigation*, MDL No. 1663, is currently proceeding in the U.S. District Court for the District of New Jersey.

## BACKGROUND

57.    There are basically three types of entities in the corporate insurance market. First, there are clients: companies such as Plaintiffs that seek to purchase insurance products for their businesses. Second, there are brokers, consultants, and independent agents (collectively "Brokers") that clients hire to

advise them as to needed coverage and to find insurance companies offering that coverage. Brokers represent the client, obtain price quotes, and advise the client on which insurance products to purchase. Third, there are insurance companies that submit quotes to the Brokers and, if selected by the client, enter into a contract to provide insurance for that client's risk.

**A.    Plaintiffs**

58.    Plaintiffs are corporate insurance clients.

59.    Plaintiffs were clients of Marsh and Aon and are pursuing claims against Marsh, Aon and all other Defendants.

60.    During the relevant time period covered by this Complaint, Plaintiffs paid hundreds of millions of dollars in premiums for insurance policies brokered by the Broker Defendants, as defined herein, and sold by the Insurer Defendants, as defined herein.

**B.    Defendants and Co-Conspirators**

61.    Marsh is the largest provider of insurance brokerage and consulting services in the world. Marsh's insurance brokerage business alone employed 42,000 employees in 410 offices located in over 100 countries during the relevant time covered by this Complaint. According to its 2003 financial statement,

Marsh's insurance brokerage business generated annual revenues of over $6.9 billion.

62. Aon is the second largest provider of insurance brokerage and consulting services in the world. Aon employed approximately 47,000 employees in offices located across the world during the relevant time covered by this Complaint. According to its 2004 annual report, Aon's risk and insurance brokerage business generated annual revenues of over $5.7 billion.

63. For purposes of this Complaint, Marsh and Aon will be referred as the "Broker Defendants."

64. For purposes of this Complaint, the following defendants will be referred to as the "Insurer Defendants": AIG, Illinois National, Lexington, National Union Pittsburgh, ACE American, ACE Bermuda, Chubb & Son, Chubb Atlantic, CNA, Continental Casualty, Hartford, Twin City, Travelers, Travelers Casualty, Gulf Insurance, Travelers Property Casualty, St. Paul F & M, XL Bermuda, XL America, Inc., XL Insurance America, XL Specialty, Liberty Mutual Insurance, Liberty Group, American Alternative, Arch, Arch US, Arch Bermuda, Endurance Specialty, HCC Insurance Holdings, Liberty Insurance, Royal & Sun Alliance, Royal & Sun, Marine Insurance, Factory Mutual, Max Re, Allianz, Fairfax,

Federal, Great American, American International, Great American Property, and
Westchester.

65.    For purposes of this Complaint, the following Insurer
Defendants, which were named as defendants in the Second Consolidated Amended
Class Action Complaint, filed in *In Re: Insurance Brokerage Antitrust Litigation,*
No. 04-5184 (D.N.J.), will be referred to as the "Class Action Insurer Defendants":
ACE American, American Alternative, AIG, Chubb & Son, CNA, Continental
Casualty, Gulf Insurance, Hartford, Illinois National, Lexington, Liberty Mutual
Insurance, National Union Pittsburgh, St. Paul F & M, Travelers Casualty,
Travelers Property Casualty, Twin City, Westchester, XL America, Inc., XL
Insurance America, and XL (Bermuda).

66.    For purposes of this Complaint, Marsh, Aon and the Insurer
Defendants will be referred to collectively as "Defendants."

67.    Various other persons, corporations, and other legal entities, not
named as Defendants herein, have participated as co-conspirators with Defendants
and have performed acts and made statements in furtherance of the conspiracies
alleged herein.

68.    Whenever reference is made in this Complaint to any act, deed
or transaction of any entity, the allegation means that the entity engaged in the act,

deed or transaction by or through one or more of its respective officers, directors, agents, employees or representatives while such persons were actively engaged in the management, direction, control or transaction of the entity's business or affairs.

## THE RELEVANT MARKET

69.    For purposes of this Complaint, the term "Insurance Products" includes without limitation commercial general liability insurance, property and casualty insurance, excess property, casualty or liability insurance, employment practices liability insurance, surety insurance, surplus lines insurance, financial services insurance, global markets property insurance, marine energy cargo insurance and proof of liability insurance.

70.    For purposes of this Complaint, the relevant market includes without limitation the market for Insurance Products and insurance brokerage services.

71.    For purposes of this Complaint, the relevant geographic market is the United States and its territories as a whole.

## TRADE AND INTERSTATE COMMERCE

72.    At all times pertinent to this Complaint, the Insurer Defendants sold, and the Broker Defendants brokered the sales of, substantial quantities of Insurance Products in a continuous and uninterrupted flow of interstate commerce.

73.    The activities of Defendants and their co-conspirators, as described herein, were within the flow of and substantially affected interstate commerce.

74.    On information and belief, at all times pertinent to this Complaint, Defendants entered into agreements and engaged in conduct directly and as co-conspirators that foreseeably and unreasonably restrained trade in the relevant market and relevant geographic market.

## THE ILLEGAL SCHEME

### 1.    The Marsh-Centered and Aon-Centered Conspiracies

75.    On information and belief, Marsh and the Marsh Insurer Defendants (as defined herein) entered into a conspiracy to allocate customers, steer business, fix prices, and rig bids (collectively, the "Marsh-Centered Conspiracy").

76.    On information and belief, Aon and the Aon Insurer Defendants (as defined herein) entered into a conspiracy to allocate customers, steer business, fix prices, and rig bids (collectively, the "Aon-Centered Conspiracy").

77.    On information and belief, the parent companies of the Insurer Defendants were aware of and directed the Insurer Defendants' illegal activities.

78.    On information and belief, the Marsh Insurer Defendants likewise knew, and agreed with each other, through Marsh, with respect to how

each would behave in the marketplace consistent with and in furtherance of the conspiracies.

79.    On information and belief, the Aon Insurer Defendants likewise knew, and agreed with each other, through Aon, with respect to how each would behave in the marketplace consistent with and in furtherance of the conspiracies.

80.    The net results of the Marsh-Centered Conspiracy and the Aon-Centered Conspiracy (collectively, the "Conspiracies") was that (a) individual commercial brokers, including Marsh and Aon, increased their profits through their receipt of undisclosed kickback payments; (b) Insurer Defendants secured and retained policyholder business and increased their premiums by suppressing competition; and (c) policyholder clients, including Plaintiffs, paid higher premiums for less advantageous coverage than that which would have been available but for Defendants' conspiracies.

## (a)    The Genesis of the Conspiracies

81.    On information and belief, since at least the early 1990s, Marsh has engaged in a scheme with the Marsh Insurer Defendants and their co-conspirators under which the Marsh Insurer Defendants have paid Marsh more than one billion dollars in so-called "commissions" to steer business to them and shield them from competition.

82.    On information and belief, Aon has engaged in a similar scheme with the Aon Insurer Defendants and their co-conspirators under which the Aon Insurer Defendants have paid Aon more than one billion dollars in so-called "commissions" to steer business to them and shield them from competition.

83.    In the early 1990s, defendants Marsh and Global Broking centralized the marketing of insurance brokering services.  Global Broking determined the placement of all of Marsh's major business lines, including Excess Casualty, Healthcare, FinPro (Financial Products), Property and Middle Market (businesses paying less that $1 million in annual insurance premiums).  Global Broking was based out of Marsh's New York office, with regional centers set up around the country to ensure that field agents and brokers were placing their clients' insurance business with Global Broking's preferred insurance carriers.  Over time, the Global Broking consolidated all of Marsh's insurance placement activity for large commercial policyholders, such as Plaintiffs.

84.    In the case of the Marsh-Centered Conspiracy, Global Broking took control of marketing and business development from field brokers and agents and imposed stringent control over the placement of all insurance business with Marsh's clients.  Marsh internally rated the Insurer Defendants based on the kickback agreements and other undisclosed fee agreements.  As a result of this

rating system, Marsh provided its employees with a "tiering report" in order to provide "clear direction on who [we] are steering business to and who we are steering business from."

85.    A "tiering report" was later circulated to Global Broking executives, assigning insurance companies to specific tiers based on how advantageous their kickback agreement was to Marsh.  In a September 2003 email, for example, a Global Broking executive directly addressed how Marsh utilized the tiering reports:  "We need to place our business in 2004 with those that have superior financials, broad coverage and *pay us the most*."  (emphasis added).

86.    On information and belief, Aon and the other conspiring brokers operated an Aon-Centered Conspiracy similar to the above-described Marsh-Centered Conspiracy.  Aon centralized insurance placement and negotiated broad, global kickback agreements with some of the Aon Insurer Defendants.  Aon also steered business to the Aon Insurer Defendants that paid the biggest kickbacks.

87.    Aon created lists of insurers whose products its employees were to sell more vigorously to clients, including Plaintiffs.  These lists were not based on price or service, but on the amount of money the Aon Insurer Defendants would pay Aon pursuant to the relevant kickback agreements.

88.    On information and belief, Aon rewarded those employees who complied with its mandate by selling clients more Insurance Products from favored insurers, and punished those who did not so comply.

**(b)    The Kickback Agreements, Often called "Placement Service Agreements"**

89.    The agreements by the Insurer Defendants to pay improper commissions to Marsh and Aon have gone by various names, including without limitation "contingent commissions," "placement service agreements" ("PSAs"), "market services agreements" ("MSAs"), "underwriter service agreements" ("USAs"), "special producer agreements," "quality business incentives awards," "preferred broker compensation plans," "competitive bonus programs," "extra compensation agreements," "overrides" and/or "bonuses." Irrespective of the particular name or title used, such agreements refer to arrangements by which Insurer Defendants to pay kickbacks to Marsh and/or Aon.

90.    Marsh entered into PSAs with the Marsh Insurer Defendants that included protection from competition and the allocation of business without competition. Kathryn Winter, a former executive of Marsh Global Broking Excess Casualty who has pled guilty to a scheme to defraud in a criminal investigation of Marsh regarding the conspiracies alleged herein, testified that a PSA with Marsh included the benefit that Marsh "protected [the insurers'] renewal business if they

hit targets they set and if they provided coverage we outlined in the broking plans we would direct new business to them."

91.    For example, the Endurance Entities[1] were allocated Insurance Products without competition as part of the Conspiracies.  Kathryn Winter of Marsh specifically testified that at a meeting with Marsh employees, it was decided to "[t]ry to funnel new business" to one of the Endurance Entities "who did us big favors recently."

92.    Marsh abided by the terms of the conspiracy and only allocated business to the Marsh Insurer Defendants that entered into the Marsh Conspiracy. Ms. Winter testified that Marsh directed its employees to "not place business with [insurers] with which [Marsh] did not have [PSAs] unless [it] had to."

93.    Marsh referred to insurance companies, such as the Marsh Insurer Defendants, which had contingent commission agreements, or PSAs, with Marsh, as "partners or preferred markets" ("Partner Markets").

94.    Mark Manzi of Marsh, who has pled guilty to a scheme to defraud in a criminal investigation of Marsh regarding the conspiracies alleged herein, testified that Partner Markets "were told what coverages on a whole they needed to provide, what policy forms, the timing that the quotes needed to be

---

[1] The "Endurance Entities" are comprised of Defendant Endurance Specialty Insurance Limited, Endurance Specialty Holdings and their affiliates.

provided. Business would be steered to them and they would be protected when they quoted per targets on their incumbent renewals."

95.    Insurance companies that were not Partner Markets because they did not enter into PSAs with Marsh were at a competitive disadvantage and, according to one Marsh employee, "their incumbency was not protected."

96.    Employees of members of the Liberty Mutual Entities[2] were aware of the role of the PSAs in the conspiracies. For example, Kevin Bott was an employee of Marsh who later went to work for one of the Liberty Mutual Entities. Mr. Bott has pled guilty to a scheme to defraud in a criminal investigation of Marsh regarding the conspiracies alleged herein. When Mr. Bott was with Marsh, he was told to make sure insurance companies without PSAs did not get business. Mr. Bott testified that, while at Marsh, "[m]y job was to insure that once I did receive a renewal quote, I would pass it off to whomever was deemed to win that bid and to make sure that they had everything they needed in order to accomplish that. I was told that I would be – my [expletive] ass would be fired if I placed a piece of business with [the insurers without PSAs]."

---

[2] The "Liberty Mutual Entities" are comprised of Defendant Liberty Insurance Underwriters, Inc., Defendant Liberty Mutual Insurance Co., Liberty Mutual Holding Company Inc. and their affiliates.

97.    Mr. Bott brought this knowledge of the operation of the Marsh-Centered Conspiracy with him in his new position with one of the Liberty Mutual Entities.

**(c)    The Kickback Agreements**

98.    On information and belief, Aon and Marsh also received kickbacks based on the rate at which their clients renewed their policies with the insurance carriers.  For example, Defendant AIG's 2003 kickback agreement with Marsh provided Marsh with a bonus of 1% of all renewal premiums if its clients renewed with AIG at a rate of 85% or higher.  If the renewal rate was 90% or higher, Marsh received 2% of the renewal premium, and if the rate was 95% or higher, Marsh received an additional 3% of the total renewal premium.  Therefore, if Marsh could get its clients to renew their policies, it would dramatically increase its total kickback revenue.

99.    On information and belief, Aon likewise entered into kickback agreements such as so-called "performance enhanced . . . agreements," which provided that Aon would receive as a "commission" approximately 17% of the premium on new business, and 10% on renewal business, placed with an insurer.  When Aon reached the threshold of $10 million of business with a carrier, Aon would retroactively get an additional 1.5% bonus based on all the business done

with that carrier for that year. Aon ultimately would choose the carriers to which it would steer insurance business based on which insurers were closer to the threshold at which Aon would get a kickback of 1.5% retroactive for the year. Accordingly, Aon would select the carrier based on either the agreement or the highest commission it could obtain, regardless of the client's best interest.

100.  Likewise, a number of the St. Paul Travelers Entities[3] were allocated business for kickbacks to Marsh. In an email dated May 12, 2003, Kathryn Winter of Marsh stated that new business should be funneled to members of the St. Paul Travelers Entities since they recently did big favors for Marsh.

101.  Ms. Winter further stated that members of the St. Paul Travelers Entities should be put in future broking plans for any new business so that they could be awarded the business if they meet the target. She wrote "St. Paul and Endurance. Reminder, that St. Paul should be used to replace Kemper since they *bought the renewal rights* to the book" (emphasis added). Simply put, Marsh would set the price and then members of the St. Paul Travelers Entities would be allocated the business without competition.

---

[3] The "St. Paul Travelers Entities" are comprised of Defendant St. Paul Fire & Marine Insurance Co., Defendant Travelers Property Casualty Insurance Co., St. Paul Travelers Co., Inc., Travelers Casualty & Surety Co. of America, Gulf Insurance Co., St. Paul Mercury Insurance Co., Travelers Excess & Surplus Insurance, The Travelers Indemnity of America and their affiliates.

102.   On information and belief, Marsh and Aon structured their business to maximize kickback payments, rather than acting in their clients' best interests in brokering insurance policies.

103.   On information and belief, Marsh carefully monitored placements to Insurer Defendants in order to assure what Marsh referred to as "maximum concentration."

104.   On information and belief, Marsh and Aon policed and enforced their efforts to maximize kickbacks by rewarding employees who increased business with Insurer Defendants and penalizing those who failed to do so.

105.   For example, in February 2003, a Marsh senior vice president in one Global Broking group nominated a subordinate to become vice president.  On the nomination form, under the heading "Financial Success," he noted that the nominee had increased Marsh's revenue "by moving" a renewing client to an insurance company with a kickback agreement.

106.   Moreover, in February 2002, a Global Broking managing director provided nine of his colleagues with a list of the insurance companies that were paying Marsh pursuant to the kickback agreements.  He cautioned, however, that "[s]ome [kickback agreements] are better than others," and said that soon Marsh would formally "tier" the insurance companies.

107.   Marsh and Aon also informed Insurer Defendants with less favorable kickback agreements that they would receive less business than those with more favorable kickback agreements.  For example, during discussions with an insurance company president seeking to expand her firm's sales, a Marsh executive did not advise her that, to earn more business from Marsh, her company should provide a better insurance product or a better price to Marsh's clients.  Instead, he told her that she would need to enter into a kickback agreement, paying Marsh an amount that was "above market."

108.   In April 2001, a Global Broking managing director in the Marsh's Excess Casualty group in New York wrote to the heads of regional centers, asking for "twenty accounts that you can move from an incumbent [insurance company]" to a company that had just extended its kickback agreement.  She issued the following warning to these individuals: "You must make sure that you are not moving business from key [contingent commission companies]."  Highlighting the incentive to follow her directive, she added: "This could mean a fantastic increase in our revenue."  In describing what Marsh had done for that company, she wrote that "they have gotten the 'lion[']s share' of our Environmental business PLUS they get an *unfair 'competitive advantage'* as our preferred [insurance company]" (emphasis added).

109.   One Marsh executive told his subordinates that the size of the kickback payments to Marsh determined "who [we] are steering business to and who we are steering business from."

110.   The Conspiracies were enormously successful.  For example, in 2003, approximately $800 million of Marsh's earnings were attributable to contingent commission payments.  That year, Marsh reported approximately $1.5 billion in net income.  Marsh, however, has never disclosed to its shareholders how contingent commissions constitute the lifeblood of its business.  Jeffrey Greenberg, the Chief Executive Officer of Marsh, stated:  "We don't break out contingent commissions.  This is not separately enumerated because it is part of our business model. . . . ."

111.   On information and belief, Marsh and Aon orchestrated and implemented this kickback and customer allocation scheme with the knowing and willing participation of the Marsh Insurer Defendants and the Aon Insurer Defendants, respectively, which also benefited financially thereby.

112.   On information and belief, either Marsh or Aon induced every one of the Insurer Defendants to enter into kickback agreements.

113.   The kickback agreements required the insurers to pay additional fees to the brokers above and beyond the fees that were known and customarily

paid by the insurers to the brokers for the placement of the business of
policyholders.

114.   The kickback arrangements facilitated the conspiracy and
constituted the illegitimate payment by the Insurer Defendants to Marsh or Aon in
exchange for Marsh's or Aon's agreement to deliver policyholder business without
competition.

115.   The vast majority of the kickback agreements were in writing,
and most Defendants began entering them annually as early as 1997.

116.   Moreover, Marsh furthered the Marsh-Centered Conspiracy by
means of other policing mechanisms.  For example, if Marsh's steering of business
to a Marsh Insurer Defendant failed, Marsh was required to provide that entity
"with a reasonable explanation of the circumstances of any non-renewal, *including
review of related documents*." (emphasis added).  This agreement in particular
reveals the powerful anticompetitive intent and effect of the kickback payments and
the attending agreements.

117.   On information and belief, in inducing the Insurer Defendants to
enter into kickback arrangements, Marsh and Aon also threatened conspiring
insurers with the discontinuation of business if they declined to participate.  Some
of these threats were explicit; others, implicit.

118.   For example, for a period of time during which members of the Chubb Entities[4] were not abiding by the conspiracy agreements, Marsh "moved all Chubb business for about a three month period from Chubb to other markets." This was done because Marsh was "punishing" them for not signing the 1999 contingent commission agreement.

119.   Marsh punished the Chubb entities by soliciting quotes from certain of the Chubb Entities, and then giving those quotes to other Marsh Insurer Defendants or their co-conspirators—"usually" to one or more of the Zurich Entities[5] and one or more of the AIG Entities[6]—in order to obtain quotes lower than those submitted by members of the Chubb Entities.   If necessary, Marsh "also enhanced the coverage to make it more attractive than the quote that Chubb had provided."

---

[4] The "Chubb Entities" are comprised of Chubb Insurance Corporation, Federal Insurance Co. and their affiliates.

[5] The "Zurich Entities" are comprised of American Guarantee and Liability, Zurich American of Illinois, Zurich Financial Services, Empire Fire & Marine Insurance Co., Fidelity & Deposit Company of Maryland, Zurich Specialties London Limited and their affiliates.

[6] The "AIG Entities" are comprised of the following: Defendant American International Group Inc., Defendant Lexington Insurance Company, Defendant Illinois National Insurance Co., Defendant National Union Fire Insurance Co. of Pittsburgh, PA, Hartford American International Specialty Lines IC, American Home Assurance Co., Insurance Co. of the State of PA, Starr Excess Liability Insurance International Limited, Steam Boiler I&I Co. and their affiliates.

120.   Members of the Chubb Entities quickly rejoined the Marsh-Centered Conspiracy.  After about forty accounts were moved from members of the Chubb Entities, members of the Chubb Entities signed new contingent commission agreements with Marsh.  Members of the Chubb Entities were "reinstated as a partner market and [Marsh] treated them as such on a go forward basis, which meant that if [members of the Chubb Entities] had incumbent business and they hit a price target and provided the coverages that [Marsh] requested, [Marsh] protected the business and [the Chubb Entities] kept it."  Signing the contingent commission agreement had made the members of Chubb Entities, once again, active participants in the conspiracy with Marsh and the other Defendants.

121.   On information and belief, Aon routinely informed the Aon Insurer Defendants of the identities of the other insurers that had entered into kickback agreements.

122.   On information and belief, Marsh routinely informed the Marsh Insurer Defendants of the identities of the other insurers that had entered into kickback agreements.  For example, Marsh not only informed Ace Bermuda that Ace Bermuda's competitor, XL, had entered into a kickback agreement, Marsh actually sent a "sanitized" copy of the XL kickback agreement to Ace Bermuda.

123.   On information and belief, Marsh and the Marsh Insurer Defendants would not have undertaken the conduct alleged herein absent agreement among all of the participants in the Marsh-Centered Conspiracy.

124.   On information and belief, Aon and the Aon Insurer Defendants would not have undertaken the conduct alleged herein absent agreement among all of the participants in the Aon-Centered Conspiracy.

125.   On information and belief, the kickback agreements in the Conspiracies varied slightly in their details, but were consistent in their general content, scope, and effect.  Most contained a number of nearly identical provisions, including the following:

a.   provisions stating that the existence and terms of the kickback arrangements were to remain secret and confidential;

b.   provisions detailing the amount of the additional funds the insurer would pay the broker for an aggregate amount of insurance business during a defined period;

c.   provisions providing the insurer with an additional incentive for retaining the business of existing policyholders; and

d.   provisions detailing the amount of additional funds the insurer would pay the broker for business with high profitability (*i.e.*, a low loss ratio).

126.   On information and belief, the amount of the kickback payments increased from their inception in the early 1990s through 2004.

(d)    **Increase in Premiums to Plaintiffs**

127.    To finance these additional improper kickbacks and to compensate themselves for the risk of their illegal activities, the Insurer Defendants increased the premiums charged to clients, including Plaintiffs, for Insurance Products.

128.    When Marsh's and Aon's clients, including Plaintiffs, paid higher premiums for Insurance Products, the volume and profitability of the Insurer Defendants' business rose, again increasing Marsh's and Aon's illegal "commissions."

129.    Karen Jacobson, a former underwriter for one of the AIG Entities, who pled guilty to a scheme to defraud in an investigation of members of the AIG Entities relating to the conspiracies alleged herein, admitted that members of the AIG Entities sought "as much premium as possible" when renewing policies, but that the premiums were not raised too high because Marsh wanted to make sure that the customers did not detect the conspiracy.

130.    For example, Annemarie Tobin of Marsh distributed the broking plan for the 2003 renewal of a policy for a client, Dyson Kissner Moran, that listed members of the AIG Entities as the "lead layer" on renewal and set the renewal premium price at $1.2 million (a 30% increase over the previous year).  Marsh's

Kathryn Winter testified that the designation of these members of the AIG Entities as the "lead layer" meant that if the designated entities hit the price set by Marsh they "will retain this renewal and if additional quotations are required they will protect AIG's position. They will be non competitive quotes, B quote[s]."

      **(e)    Bid Rigging**

      131.   On information and belief, Marsh developed "Broking Plans," which included target prices for the incumbent and a list of two or three Partner Markets, who were not the incumbent insurers, but who were selected by Marsh to offer phony competitive bids. Phony bids were needed only in the event that a policyholder needed to be falsely assured that Marsh was getting competitive bids on that policyholder's business. In most instances this was not necessary, but in those cases where a policyholder required such assurance, Marsh needed a mechanism to hide the fact that it was not, in fact, seeking and obtaining genuinely competitive bids for its clients. Thus, in order to further the Marsh-Centered Conspiracy, Marsh told the designated Partner Markets what terms and prices to bid. These bids were higher than the incumbent's bid and often had worse coverage terms.

      132.   These phony bids were called variously "B bids," "alternative quotes," "protective quotes," or "backup quotes." Marsh often told the Partner

Markets providing the B bids the price and terms of the winning bid of the incumbent before the insurance business was placed.

133.   Marsh designated a winner, and then solicited inflated bids from other insurance companies, including the Marsh Insurer Defendants, which provided such bids, knowing that later they themselves would have a turn to get business without meaningful competition by means of a similar submission of inflated bids by other conspiring insurers, including the Marsh Insurer Defendants.

134.   Marsh rigged the bidding on policies by setting the "target" price to allow the Marsh Insurer Defendants to realize inflated profits while protecting the conspiracy from detection.  As Marsh's Kathryn Winter testified, Marsh would only set a lower price than insurers would be happy with when it felt that the insured was considering moving its business to another broker.

135.   Marsh solicited fake or B quotes from the Marsh Insurer Defendants in order to ensure that a client would select the Insurer Defendant that it had designated.  For example, Ms. Winter repeatedly testified that Marsh would obtain "quotes from other markets that were noncompetitive" to "artificially make the quote the most attractive quote."  The protected Insurer Defendant would then have the most attractive quote based on the cooperation of Marsh and the other Insurer Defendants.  Another former Marsh employee, Mary Anne Baret, who has

pled guilty to a scheme to defraud in a criminal investigation of Marsh regarding the conspiracies alleged herein, testified that she would procure false or misleading B-quotes or backup quotes through other carriers in order to continue the incumbent into their renewal position.

136.    AIG's Karen Jacobson testified as to William Gilman's description of how the conspiracies operated.  William Gilman was the Executive Marketing Director of Marsh and the head of Marsh's Excess Casualty; he is currently on trial for his participation in the conspiracies alleged herein.  Ms. Jacobson testified that, in 1999, Mr. Gilman described to her a system for labeling accounts in the bidding process.  He told her that an A quote was a quote that had no competition and the incumbent was going to keep the account.  There would be no bidding process.  And a B account includes all the other bids that intentionally would be worse than the incumbent.  The purpose of B quotes was to ensure that the incumbent carrier would keep the bid by falsely making it appear to the insured, the risk manager, that there was competition.

137.    Ms. Jacobson further testified that members of the AIG Entities understood that when Marsh requested an "alternative quote," or B quote, "AIG was not going to win [the] account" and the fake bid was "[n]ot to beat the carrier

who has been chosen to write the account" but, "[t]o show, to pretend to show competition where there is none."

138.   Individual employees of members of the AIG Entities have admitted that B quotes were false quotes.  AIG's Karen Jacobson (f/k/a Karen Radke) testified that there was no real competition on protective quotes or B quotes. "If Marsh asked for a B-quote, that meant that AIG was to give out an uncompetitive bid."

139.   Members of the AIG Entities submitted B quotes in furtherance of the Marsh-Centered Conspiracy.  For example, one of the AIG Entities did not compete on a policy renewal for Hasco Homes in December 2001.  A Broking Plan for Hasco Homes was sent by Ed McNenney of Marsh on December 12, 2001 to Jacobsen of the AIG Entities.  Jacobsen testified she understood the broking plan meant that members of the AIG Entities would not be allocated that account and were to provide a "B quote."

140.   Likewise, members of the ACE Entities[7] participated in the submission of artificial bids in order to rig placements and protect other members of the Marsh-Centered Conspiracy.  For example, Patricia (Byrne) Abrams, who has

_____

[7] The "ACE Entities" are comprised of Defendant ACE American Insurance Company, Defendant ACE Bermuda Insurance Co. Ltd., ACE Limited, ACE USA, Inc., Illinois Union Insurance Company, Pacific Employers Insurance Company and their affiliates.

pled guilty to a scheme to defraud in a criminal investigation of Marsh regarding

the conspiracies alleged herein, faxed on December 13, 2002 a quote confirmation

of $990,000 for the Fortune Brands account to Heidi Haber of Marsh. Dennis

Burton, an underwriter for one of the ACE Entities, told Abrams, that Greg Doherty

was complaining that the quote was "too competitive" and wanted the quote

increased. So Ms. Abrams sent Mr. Doherty a new higher quote at $1.1 million by

fax on December 17, 2002. Mr. Doherty again complained that it was not high

enough and said to increase it to $1.5 million. Ms. Abrams then quoted the policy

at $ 1.5 million.

      141.   Likewise, once members of the ACE Entities knew what type of

quote to provide to Marsh, and once they learned the amount of the bid submitted

by one of the Marsh Insurer Defendants or their co-conspirators, they provided a

bid that was "out of the ballpark."

      142.   The level of participation in the Marsh-Centered Conspiracy by

members of the ACE Entities was widespread. For example, Ms. Abrams admitted

that she participated in the practice of submitting B quotes when Marsh requested

it. She understood that a B quote was a quote where members of the ACE Entities

were not considered a market.

143.    Moreover, in 2003, Crawford and Company, one of Marsh's clients, was seeking insurance coverage.  Ms. Abrams testified that members of the ACE Entities wanted to write the business.  But after Ms. Abrams emailed in a quote on behalf of a member of the ACE Entities for $370,000 on April 25, 2003 to Heidi Haber of Marsh, Mr. Doherty informed the member that ACE was not supposed to get the Crawford and Company account and that it should increase the price.  Specifically, Mr. Doherty told the member to increase the quote to $550,000 and on April 29, 2003 Ms. Abrams sent the higher quote to Ms. Haber by email.

144.    Members of the Liberty Mutual Entities also submitted B quotes in order to conceal the lack of competition between Marsh and the Marsh Insurer Defendants.  For example, on a renewal of an account for Merle Norman Cosmetics, one of the AIG Entities was the expiring lead carrier.  An employee of Marsh wrote that "Merle Norman is prepared to purchase less limits if we come in too high.  Please send to Zurich, Liberty, PRB and GA for B quotes."  On March 26, 2003, in furtherance of that request, Ed Keane, a Marsh employee, emailed the following to Marsh's Greg Doherty: "Doherty, I need a B quote from Liberty, I finally had AIG agree to write this thing at the target.  Have Liberty come in around 175 thousand dollars.  E-mail indication would be fine.  Thanks, Ed."

145.    Members of the Liberty Mutual Entities were aware of the important role of B quotes in the Marsh-Centered Conspiracy.  For example, Marsh's Kevin Bott testified that, during his time with one of the Liberty Mutual Entities, he understood that if one of the Liberty Mutual Entities was asked to provide a B quote, it was to be less attractive than that of the incumbent or understood winner of that bid.  He received requests for B quotes from Marsh a couple times a month and provided those B quotes willingly.  Members of the Liberty Mutual Entities expected the same protection for themselves on other accounts.

146.    Members of the Zurich Entities were also active participants in the Marsh-Centered Conspiracy.  For example, Geri Mandel, an underwriter for one of the Zurich Entities, never refused to provide Marsh with B quotes.  The Zurich Entities were protected as the incumbent if they met the target prices set by Marsh.

147.    Members of the Zurich Entities raised premiums because they knew that other Marsh Insurer Defendants and their co-conspirators would not compete once Marsh had allocated the Insurance Products.  For example, on March 8, 2002, Amy DuBuque of Marsh emailed a broking plan for Constellation Brands, Inc. to Regina Hatton, Kathy Drake and Ed McNenney of Marsh.  The plan set a target rate of $410,000 for an incumbent member of the Zurich Entities to meet.

The designated incumbent took advantage of this opportunity. On March 29, 2002, Carrie Raspantini of Marsh faxed a binder confirmation from Bernadette Linden of the Zurich Entities with an even higher quote of $490,000 to Mary Ann Acker of Marsh.

148.    In furtherance of the Marsh-Centered Conspiracy, members of the Zurich Entities provided B quotes on other occasions at Marsh's direction.  For example, on June 17, 2003, Marsh circulated a broking plan for a policy for the Vivendi Universal account.  The broking plan read in part as follows: "Zurich to quote an alternate lead to AIG and possible 50 mil xs 50 mil."  One of the AIG Entities had been designated by Marsh to get the business.  Marsh's Kathryn Winter, who authored this broking plan, testified that she sent by email a copy of the broking plan to Nicole Michaels on June 27, 2003, a Marsh employee who worked with one of the Zurich Entities, who has pled guilty to a scheme to defraud in a criminal investigation of Marsh regarding the conspiracies alleged herein.  According to Ms. Winter, the purpose of this was "to get a B quote, a protective quote from Zurich and that is why I'm giving her, I'm outlining the entire AIG quote for her…so that Zurich can quote non-competitively, so they can give a higher quote or less attractive quote based on attachment points or limits or exclusions."  That same day, Ms. Michaels wrote to Roberta Rudder, an

underwriter for one of the Zurich Entities, requesting as follows: "Can you email me a protective indication on this account. AIG's pricing and attachments are below. Thanks, Nicole." In response, Ms. Rudder sent the protective quote Marsh requested within 30 minutes on June 27, 2003.

149.   On July 22, 2002, in reference to a policy for the Agere account, Ms. Michaels wrote to Patrick Kenahan, an underwriter at one of the Zurich Entities, as follows: "Patrick. AIG quoted this, they are on the parent company Lucent. They have quoted 47,500,000 x 2,500,000/5mm/5mm = $600,000. Please offer a high protective quote on this. You are slotted in the excess. Let me know if you have any other questions. Thanks, Nicole." Ms. Michaels then emailed the following to Ms. Rudder on July 23, 2002: "Please offer a protective quote. Patrick will quote the excess when he returns. I am faxing over a copy of AIG's lead, so make sure you quote a protective."

150.   Marsh allocated business to members of the Zurich Entities as a direct result of protecting other Marsh Insurer Defendants and their co-conspirators through the submission of B quotes. For example, Ms. Winter of Marsh sent the following in a March 24, 2003 email to Joe Peiser of Marsh, explaining how members of the Zurich Entities would be allocated policies: "The plan was revised last week to give Zurich London a layer. No, this is not the same layer that Gerling

had, however, when I require markets like Zurich and MARP to do full B quotes

for a lead to protect AIG I feel they should be given the 25 x 25 layer." Members

of the Zurich Entities were allocated other layers of the policies simply because

they protected other Marsh Insurer Defendants.

151.   Marsh was able to rig the bidding on policies because the Marsh

Insurer Defendants allowed Marsh to set the price that the Insurer Defendants

quoted on the policies.  Ms. Winter testified that Marsh prepared most of the quote

confirmations that the conspiring insurers provided.

152.   Marsh managed and oversaw the Marsh-Centered Conspiracy

because that role allowed Marsh the power to maximize kickbacks from the Marsh

Insurer Defendants.  Marsh's William Gilman explained as follows: "If we had

control over the business then we could make the insurance companies give us

lucrative placement service agreements we would have the ability to reward them

or take the business away. We had control over whether or not they got the

business."

153.   Marsh managed the customer allocation conspiracy with the

Insurer Defendants.  However, the Insurer Defendants and their co-conspirators

also made sure that Marsh abided by the terms of the conspiracy by ensuring that

they were informed of any change in customer allocation.  For example, in a March

14, 2003 email, Kathryn Winter recounted a meeting she had with Marsh's Joe

Peiser: "Per Joe, if reasonable quote dates are missed, then we are free to give the

lead/layer to another market." However, Ed McNenney, a former employee of

Marsh who has been indicted on charges relating to the conspiracies alleged herein,

reminded other Marsh employees that the customer allocation was not to be

changed without the Insurer Defendants' knowledge: "We will not vary from any

gameplan or replace any carrier's [sic] without my explicit agreement. . . . We can't

allow back door moves without full disclosure or knowlege [sic]."

154.    Ms. Winter testified that if she created a broking plan where the

XL Entities[8] were slotted for the lead umbrella at a target price, they would be

awarded that policy provided they came in at that target price with the proper

coverage.  If she was required to get additional quotations she would obtain

protective quotes or B quotes.

155.    On information and belief, Marsh created broking plans to

protect the Marsh Insurer Defendants who had been allocated a policy and to solicit

B quotes from other Insurer Defendants.  For example, on September 16, 2002,

Marsh's Mary Anne Baret circulated a broking plan via e-mail for the Curtiss

---

[8] The "XL Entities" are comprised of Defendant XL Insurance America, Inc., Defendant
XL Specialty Insurance Company, Greenwich Insurance Company, XL Insurance Company Ltd.,
XL Capital Ltd. and their affiliates.

Wright account. The email and broking plan indicated that "AIG/STP/ACE are my

back up," which, according to Ms. Baret, meant that members of the AIG Entities,

the St. Paul Travelers Entities and the ACE Entities were going to provide

alternative lead quotes, or B quotes.

156.   Various Marsh employees participated in the conspiracy. For

example, Ms. Baret testified that she, along with other employees of Marsh,

protected incumbents by asking for intentionally losing quotes. Likewise, Mark

Manzi of Marsh admitted that he requested B quotes from members of the Liberty

Mutual Entities.

157.   For example, in late July 2001, Marsh had an internal

discussion—largely by email—concerning insurance for IBP Inc.'s ("IBP") in the

upcoming year. One Marsh executive explained that Tyson Foods, Inc. ("Tyson")

was considering acquiring IBP and advocated that the insurance business now be

steered to the incumbent insurer for Tyson's business, Zurich. The Marsh

executive pre-designated "Zurich as the favorite for the lead" without soliciting any

bids, referring to the former IBP insurer as a "type B account."

## 2.   The Insurer Defendants Knowingly Participated in the Marsh-Centered and Aon-Centered Conspiracies.

158.   On information and belief, each Insurer Defendant was a willing

and knowing participant in the Conspiracies alleged herein. Under these

Conspiracies, each Insurer Defendant either issued insurance polices to Plaintiffs or, in the case of the parent companies of the insurers, orchestrated the issuance of such policies.

159. On information and belief, by the early 2000s, the dollar amount of the kickback payments from the Insurer Defendants to Marsh and Aon equaled or exceeded the known, above-board compensation paid by the Insurer Defendants to Marsh and Aon.

160. Every Insurer Defendant received money from the Plaintiffs' premiums.[9] On information and belief, the Plaintiffs were victims of the Marsh-Centered Conspiracy. On information and belief, Plaintiffs were victims if the Aon-Centered Conspiracy.

161. On information and belief, each Insurer Defendant entered into the kickback arrangements after significant internal deliberation because each recognized the enormous (though illegal) benefits to be derived from joining the agreement.[10]

---

[9] Plaintiffs have not yet confirmed that American International received premium from Plaintiffs.

[10] In recent testimony, Marsh's Josh Bewlay testified that Allianz did not sign a PSA.

162.   On information and belief, each Insurer Defendant also understood the nature and scope of the illegal arrangements, and recognized the benefits of participating in them.

163.   For example, AIG's Karen Jacobson (f/k/a Karen Radke) testified under oath that, in 2001, she spoke with William Gilman of Global Broking, who told her about the "Marsh system" and that it was very important that members of the AIG Entities "stay in line" and "not compete for other business."

164.   The participation by members of the AIG Entities in the Marsh-Centered Conspiracy was widespread. For example, in a March 18, 2002 email from AIG's Karen Radke to Marsh's Ed McNenney—with the subject line: "B's"—Ms. Jacobson requested a list of accounts for which Marsh would like members of the AIG Entities to write B quotes. These members wanted to know from Marsh the accounts for which it would not be competing.

165.   Members of the AIG Entities were aware of the Conspiracies, including Marsh's role in coordinating the Marsh-Centered Conspiracy. For example, Marsh told Charles Williamson, an employee of one of the AIG Entities, how the agreement worked and that it was important that he not do any favors for any brokers or insurance companies until or unless he had talked to Global Broking about the gameplan on a particular risk.

166.    The participation by members of the AIG Entities in the Conspiracies was based on their agreement with other Insurer Defendants to participate in the Conspiracies. For example, as AIG's Karen Jacobson testified, a quote by one of the AIG Entities would look like a winning bid because Marsh would solicit quotes that were not competitive from other insurers.

167.    Moreover, the AIG Entities received confidential information from Marsh about other insurers participating in the conspiracy. For example, Marsh gave members of the AIG Entities a list of accounts held by The Chubb Corporation and its affiliates that included each policyholder's limit for insurance, the premium for that limit, the inception date and the expiring date. Such information was typically considered private in the insurance industry.

168.    On information and belief, the Marsh Insurer Defendants understood that the overarching goals of the Marsh-Centered Conspiracy, from their perspective, were to increase revenues paid to them and to suppress or eliminate competition. Each Marsh Insurer Defendant was aware of the general nature of this scheme and its role in facilitating the objectives of the conspiracy. Each Marsh Insurer Defendant enjoyed supra-competitive profits as a result of the conspiracy, to the detriment of Plaintiffs.

169. On information and belief, the Aon Insurer Defendants understood that the overarching goals of the Aon-Centered Conspiracy, from their perspective, were to increase revenues paid to them and to suppress or eliminate competition. Each Aon Insurer Defendant was aware of the general nature of this scheme and its role in facilitating the objectives of the conspiracy. Each Aon Insurer Defendant enjoyed supra-competitive profits as a result of the conspiracy, to the detriment of Plaintiffs.

170. On information and belief, each Marsh Insurer Defendants and the Aon Insurer Defendants have agreed to the overall objectives of the Marsh-Centered Conspiracy and the Aon-Centered Conspiracy, respectively.

171. On information and belief, in exchange for the payments of the above-described kickbacks, Marsh and Aon and each insurer that paid kickbacks in furtherance of the Conspiracies, including all Insurer Defendants, agreed that the broker would provide the insurer with the following benefits:

    a.    assurance that the insurer would retain existing policyholder business;

    b.    an agreement to insulate the insurer from actual competition;

    c.    an agreement that the broker would place business only with insurers that had agreed to pay the kickbacks;

    d.    assurance that the insurer could increase the premiums charged to policyholders without fear of losing the business;

e.     information about competitive bids;

f.     an agreement to decline to even solicit quotes from insurers that had not executed kickback agreements, even if such insurers might offer the best quote on price and/or terms;

g.     a commitment not to negotiate lower prices or better terms for the policyholders; and

h.     an agreement to relieve the insurer of the burden of having to respond to actual competition for policyholder business, so that the insurer could offer its clients, including Plaintiffs, poorer terms at higher prices.

172.   On information and belief, the participants in the Marsh-Centered Conspiracy and the participants in the Aon-Centered Conspiracy respectively agreed to engage in the same pattern and course of conduct and activity, and committed a series of affirmative and overt acts to advance the respective goals of the Marsh-Centered Conspiracy and the Aon-Centered Conspiracy, including:

a.     the Insurer Defendants' acceptance of payments from policyholders, such as Plaintiffs, that were the product of the scheme described herein;

b.     the Insurer Defendants' payment of kickbacks to the broker;

c.     the Insurer Defendants' provision of copies of their kickback agreements with one broker to a supposedly competing broker;

d.     the Insurer Defendants' agreements not to seek to secure policyholder business from legitimate, non-conspiring brokers;

e.     the Insurer Defendants' repeated and annual entry into kickback agreements;

f.      the broker's inducement of the Insurer Defendants to pay the kickback payments;

g.      the broker's acceptance of kickback payments from the Insurer Defendants;

h.      the broker's entry into agreements between themselves and their clients, which included either no language or vague and incomplete language purporting, but failing, to disclose compensation arrangements between and among Marsh and the Marsh Insurer Defendants, or Aon and the Aon Insurer Defendants;

i.      Marsh's and Aon's participation in similar tactics for steering customers to the Marsh Insurer Defendants and the Aon Insurer Defendants, respectively, and for placement of those Insurer Defendants' policies;

j.      Marsh's and Aon's performance of similar tactics for steering business, and allocating markets and customers;

k.      Marsh's and Aon's performance of similar tactics for boycotting or refusing to deal with insurers who refused to participate in the respective conspiracies;

l.      the entry of the participants in the Marsh-Centered Conspiracy and the Aon-Centered Conspiracy, respectively, into similar agreements regarding concealment of the terms or existence of the kickback agreements, and similar agreements regarding kickback agreements and other payments between and among the participants in the Marsh-Centered Conspiracy and the Aon-Centered Conspiracy, respectively;

m.     the assent of the participants in the Marsh-Centered Conspiracy and the Aon-Centered Conspiracy, respectively, to similar practices regarding the reporting of their arrangements.

173.    On information and belief, the Broker Defendants also told the

Insurer Defendants about the identity of other Insurer Defendants that had entered

into the kickback arrangements, including the terms and conditions of the other kickback agreements.

### 3.    Effects of the Illegal Scheme

174.    The amount of the kickback payments that were received by Marsh and Aon had a material impact on their respective overall profitability. The kickbacks resulted in improper conduct, including steering, customer allocation, and bid-rigging because they were intended to and in fact created an incentive for Marsh and Aon to:

a.    maximize the volume of insurance placed with the Insurer Defendants;

b.    maximize the volume of renewal business placed with the Insurer Defendants;

c.    fail to seek, on behalf of their clients, including Plaintiffs, the most advantageous terms on the insurance coverage;

d.    fail to advise their clients, including Plaintiffs, to negotiate reductions of premiums payable through adjustments of terms, such as deductibles, in order to maximize the profitability of those policies for purposes of calculating the kickback payments; and

e.    discourage clients, including Plaintiffs, from filing certain claims under their policies in order to maximize the profitability of those policies for purposes of calculating the kickback payments.

175.    Defendants' unlawful contracts, combinations or conspiracies have had at least the following effects since the early 1990s:

  a.  Plaintiffs have had to pay more for Insurance Products than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities;

  b.  Defendants have had no incentive to offer insurance policies with better terms or more competitive prices;

  c.  price competition in the sale of Insurance Products has been restrained, suppressed and eliminated in the United States; and

  d.  Plaintiffs have been injured and financially damaged in their business and property, in amounts that are currently undetermined.

### 4. Criminal Charges for Participation in the Conspiracies

176. Multiple individuals associated with Marsh, the Insurer Defendants, and various other co-conspirators with Defendants not named as Defendants herein, were indicted for their roles in the conspiracies alleged herein. Many of those indicted pled guilty to the offenses for which they were indicted.

177. In 2005, Joshua Bewlay, former Head of Marsh Global Broking Excess Casualty, was indicted by the New York Attorney General on two counts of operating a scheme to defraud in the 1st degree for his participation in the conspiracy, a Class E felony. On February 2005, Mr. Bewlay pled guilty to engaging in a scheme with intent to defraud and admitted that he obtained non-competitive bids while working for Marsh. On information and belief, Mr. Bewlay was directly involved in placing insurance business for the Plaintiffs.

178.   In March 2006, Mary Anne Baret, a former employee of Marsh Global Broking, was indicted by the New York Attorney General on a charge of restraint of trade and competition, a Class E felony.  In August, 2005, Ms. Baret pled guilty to acting in "restraint of trade" and engaging in a "scheme to maximize profits by controlling the market and protecting selected insurance companies." Ms. Baret admitted that she "instructed underwriters to submit B quotes" and "caused purposefully losing quotes to be conveyed to Marsh clients."

179.   In 2005, Regina Hatton, a former Marsh employee assigned to work with the Zurich Entities, was indicted by the New York Attorney General for participation in a scheme to defraud in the 1st degree, a Class E felony.  In August 2005, Ms. Hatton pled guilty to participating in a "scheme to defraud" and engaging in a "scheme to maximize profits by controlling the market and protecting selected insurance companies."  She admitted to instructing underwriters to submit B quotes and she admittedly "caused purposefully losing quotes to be conveyed to Marsh clients."

180.   In 2005, Mark Manzi, former head of Marsh Global Broking Healthcare, was indicted by the New York Attorney General for participating in a scheme to defraud in the 1st degree, a Class E felony.  In June 2005, Mr. Manzi pled guilty to participating in a scheme to defraud, engaging in a scheme to

maximize profits by controlling the market and protecting selected insurance companies, instructing underwriters to submit non-competitive bids, engaging in deception and intentionally causing non-competitive quotes to be conveyed to Marsh clients.

181.   In 2005, Nicole Michaels, a former Marsh employee assigned to work with the St. Paul Travelers Entities, the Liberty Mutual Entities, and others was indicted by the New York Attorney General for acting in restraint of trade and competition, a Class E felony.  In August 2005, Ms. Michaels pled guilty to acting in restraint of trade, engaging in a scheme to maximize profits by controlling the market and protecting selected insurance companies, instructing underwriters to submit B quotes, directing insurance carriers to hit a target price, engaging in deception, and intentionally causing non-competitive quotes to be conveyed to Marsh clients.

182.   In 2005, Jason Monteforte, a former Marsh employee assigned to work with the AIG Entities, was indicted by the New York Attorney General for acting in restraint of trade and competition, a Class E felony.  In August 2005, Mr. Monteforte pled guilty to acting in restraint of trade, and soliciting "intentionally losing bids."

183.   In 2005, Todd Murphy, a former employee of Marsh, was indicted by the New York Attorney General for participating in a scheme to defraud, a Class E Felony.  In July, 2005, Mr. Murphy pled guilty to participating in a scheme to defraud, engaging in a scheme to maximize profits by controlling the market and protecting selected insurance companies, engaging in deception, and intentionally causing non-competitive quotes to be conveyed to Marsh clients.

184.   Robert Stearns, a former manager of Marsh Global Broking, was indicted by the New York Attorney General for participating in a scheme to defraud, a Class E felony.  In January, 2005, Mr. Sterns pled guilty to participating in a scheme to defraud, engaging in a scheme to maximize profits by controlling the market and protecting selected insurance companies, instructing non-incumbent insurance markets to submit non-competitive bids, engaging in deception, and intentionally causing non-competitive quotes to be conveyed to Marsh clients.

185.   In 2005, Kathryn Winter, a former manager of Marsh Global Broking, was indicted by the New York Attorney General for participating in a scheme to defraud, a Class E felony.  In February 2005, Ms. Winter pled guilty to participating in a scheme to defraud, engaging in scheme to maximize profits by controlling the market and protecting selected insurance companies, instructing non-incumbent insurance markets to submit non-competitive bids, engaging in

deception, and intentionally causing non-competitive quotes to be conveyed to Marsh clients.

186.   In addition other former employees of Marsh have been indicted for related offenses, including Peter Anderson, Edward Keane, George Nicolai, William Gilman, and Edward McNenney.

187.   In 2005, Carlos Coello, a former employee of one of the AIG Entities, was indicted by the New York Attorney General for participating in a scheme to defraud.

188.   In 2005, John Mohs, a former assistant manager of one of the AIG Entities, was indicted by the New York Attorney General for participating in a scheme to defraud, a Class E felony.  On February 15, 2005, Mr. Mohs pled guilty to participating in a scheme to defraud, engaging in a scheme to maximize profits by controlling the market and protecting selected insurance companies, complying with requests to submit deceptive bids, engaging in deception, and intentionally conveying quotes to policy holders through Marsh under false and fraudulent pretenses.

189.   On October 13, 2004, Karen Jacobson, a former underwriter for one of the AIG Entities, was indicted by the New York Attorney General for participating in a scheme to defraud, a Class E felony.  On that same date, Ms.

Jacobson pled guilty to participating in a scheme to defraud, engaging in a scheme

to maximize profits by controlling the market and protecting selected insurance

companies, complying with requests to submit deceptive bids, engaging in

deception, and intentionally conveying quotes to policy holders through Marsh

under false and fraudulent pretenses.

190.   In 2004, Jean-Baptiste Tateossian, a former employee of one of

the AIG Entities was indicted by the New York Attorney General for participating

in a scheme to defraud in the 1st degree, a Class E felony.  In October 2004, Mr.

Tateossian pled guilty to participating in a scheme to defraud, complying with

requests to submit deceptive bids, participating in a scheme with Marsh to control

the market and protect incumbent insurance companies.

191.   In October 2004, Patricia Abrams, a former Vice President of

one of the ACE Entities was indicted by the New York Attorney General for

restraining trade and competition, a Class E felony.  In October 2004, Ms. Abrams.

pled guilty to acting in restraint of trade, entering into agreements with Marsh to

submit bids that were not competitive, and submitting B quotes.

192.   In 2005, Kevin Bott, a former underwriter for one of the Liberty

Mutual Entities and former employee of Marsh, was indicted by the New York

Attorney General for restraining trade and competition, a Class E felony.  In

September 2005, Mr. Bott pled guilty to acting in restraint of trade and complying with requests for B bids.

193.   In 2004, Edward Coughlin, a former Senior Underwriter for one of the Zurich Entities, was indicted by the New York Attorney General for acting in restraint of trade and competition, a Class E felony.  In November 2004, Mr. Coughlin pled guilty to acting in restraint of trade and complying with requests for B bids.

194.   In 2004, John Keenan, a former Senior Underwriter for one of the Zurich Entities was indicted by the New York Attorney General for acting in restraint of trade and competition, a Class E felony.  In November 2004, Mr. Keenan pled guilty to acting in restraint of trade and competition.

195.   In 2005, James Spiegel, a former Senior Underwriter for one of the Zurich Entities, was indicted by the New York Attorney General for participating in a scheme to defraud, a Class E felony.  In August 2005, Mr. Spiegel pled guilty to participating in a scheme to defraud and complying with requests for B quotes.

### 5.    Marsh's and Aon's misrepresentations to Sears

196.   Marsh made material misrepresentations to Sears in a Services Agreement sent on or about January 1, 1997 by Steven H. Kerr, Managing Director

of Marsh USA Inc. to Pamela G. Rogers, Director of Risk Management for Sears. The agreement was signed by both Mr. Kerr and Ms. Rogers. Marsh USA Inc. ("the Contractor") made the following misrepresentations:

- Marsh warranted "that all Services performed by Contractor shall be consistently of the highest quality";

- Marsh warranted that it would "comply with all applicable federal, state and local laws, rules, regulation and orders";

- Marsh represented that "[i]f Contractor procures coverage for Sears, Contractor shall use commercially reasonable efforts to obtain the coverage to meet Sears' needs…";

- Marsh agreed that it would recommend "[m]arket strategy" to Sears;

- Marsh agreed that "Contractor shall work with Sears to negotiate terms and conditions on all contracts of insurance and service between Sears and insurance companies and various service companies";

- Marsh agreed that "Contractor shall prepare a comparative analysis of coverage, and service proposals submitted by insurers that shall include Contractor recommendations as to cost, coverage and service"; and

- Marsh agreed that "Contractor, where appropriate, shall utilize Contractor's national and international facilities to assure all expertise within Contractor is effectively employed in the placement and administration of all policies for the insurance coverages set for in the Schedule of Insurance and provide appropriate assistance to Sears operations wherever located to the extent Contractor can lawfully do so."

197.   These statements were false because under Marsh's Scheme as described above, Marsh intentionally did the following:

- did not perform consistently high quality services;

- did not comply with all applicable laws;

- did not obtain insurance that met Sears' needs;

- did not properly recommend market strategy to Sears;

- did not properly negotiate terms and conditions of insurance contracts; and

- did not fairly analyze the coverage it recommended to Sears or effectively employ its expertise in the place of insurance policies or provide appropriate assistance to Sears.

198.   Marsh intended Sears to rely on its statements to induce Sears to hire Marsh and continue to retain Marsh during the period of the Scheme.

199.   Marsh used its best efforts to steer the placement of insurance to maximize its own commissions and solicited fraudulent "B" quotes to deceive its clients.

200.   Sears detrimentally relied on Marsh's misrepresentations in hiring Marsh and continuing to use Marsh to procure its insurance needs.  Sears was damaged by Marsh's scheme because it paid premiums that were artificially inflated by Marsh.  Sears was also damaged because it received coverage that was not as broad as it would have been had Marsh not engaged in its Scheme.

201.   The Services Agreement was extended twice by written agreement to cover the period ending December 31, 2001.  The agreements were signed on or about January 1, 2000 and January 1, 2001 and signed both times by Mr. Kerr for Marsh and Ms. Rogers for Sears.

202.   Aon made material misrepresentations to Sears in a Services Agreement sent on or about April 1, 1998 by Patricia DeLeonardis, Senior Vice President of Aon Risk Services, Inc. of Illinois to Pamela G. Rogers, Director of Risk Management for Sears.  The agreement was signed by both Ms. DeLeonardis and Ms. Rogers.  Aon ("the Contractor") made the following misrepresentations:

- Aon warranted "that all Services performed by Contractor shall be consistently of the highest quality;"

- Aon agreed it would "not intentionally do or perform an act or omission injurious or prejudicial to Sears or contrary to the best interest of Sears;"

- Aon warranted that it would "comply with all applicable federal, state and local laws, rules, regulation and orders;"

- Aon agreed it would "establish strategy for renewal" of Sears' various insurance policies;

- Aon represented that it would "[d]iscuss with Sears renewal strategy and changes in the marketplace;" and

- Aon agreed to "promptly report to Sears any commission or other payment it receives in addition to the Fee for any given insurance coverage...."

203.   These statements were false because under Aon's Scheme as described above, Aon intentionally did the following:

- did not perform consistently high quality services;

- performed acts or omissions that were injurious or prejudicial to Sears and contrary to the best interests of Sears;

- did not comply with all applicable laws;

- did not establish proper renewal strategies for Sears;

- did not discuss actual renewal strategies or changes in the marketplace with Sears; and

- did not promptly report to Sears its commissions.

204.   Aon intended Sears to rely on its statements to induce Sears to hire Aon and continue to retain Aon during the period of the Scheme.

205.   Aon used its best efforts to steer the placement of insurance to maximize its own commissions.

206.   The Services Agreement was extended twice by written agreement to cover the period ending December 31, 2001.  The amendment for the period December 31, 1999 to December 31, 2000 was signed by Ms. Leonardis for Aon on February 24, 2000 and by Ms. Rogers for Sears on March 2, 2000.   The amendment for the period December 31, 2000 to December 31, 2001 was signed on or about December 31, 2000 by Ms. DeLeonardis for Aon and Ms. Rogers for Sears.

207.   Sears detrimentally relied on Aon's misrepresentations in hiring Aon and continuing to use Aon to procure its insurance needs.  Sears was damaged by Aon's scheme because it paid premiums that were artificially inflated by Aon.

Sears was also damaged because it received coverage that was not as broad as it would have been had Aon not engaged in its Scheme.

## COUNT I
### (Sherman Act Against Broker Defendants and Class Action Insurer Defendants)

208. Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 207.

209. This count describes two broker-centered horizontal antitrust conspiracies, orchestrated by the Marsh and Aon and involving Marsh and the Marsh Insurer Defendants (as defined herein) and Aon and the Aon Insurer Defendants (as defined herein), respectively, to allocate customers, steer business, reduce competition, and maintain artificially high premiums. This count does not rely upon fraud or misrepresentation by any of the defendants, although such events occurred, as alleged herein and described in other counts.

210. On information and belief, Defendants and their co-conspirators engaged in continuing illegal contracts, combinations or conspiracies with respect to the sale of Insurance Products in the United States in an unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

211.    Beginning at least by the early 1990s and continuing through at least 2004, Marsh, together with the Marsh Insurer Defendants (as defined herein) and others, conspired unreasonably to restrain trade and commerce in violation of the Sherman Act by, among other things: (1) providing persons seeking to purchase primary Insurance Products with collusive and non-competitive bids or other terms of sale; (2) allocating the opportunity to sell, and the sale of, Insurance Products to clients, including Plaintiffs; and (3) creating a scheme to pay Marsh to implement the unlawful conspiracy.

212.    Beginning at least by the early 1990s and continuing through in or about 2004, Aon, together with the Aon Insurer Defendants (as defined herein) and others conspired unreasonably to restrain trade and commerce in violation of the Sherman Act by, among other things: (1) providing persons seeking to purchase primary Insurance Products with collusive and non-competitive bids or other terms of sale; (2) allocating the opportunity to sell, and the sale of, Insurance Products to clients, including Plaintiffs; and (3) creating a scheme to pay Aon to implement the unlawful conspiracy.

213.    This claim is brought by the following Plaintiffs against the following Defendants:

    a.    Marsh clients against Marsh and the Class Action Insurer Defendants that participated in the Marsh-Centered Conspiracy; and

    b.    Aon clients against Aon and the Class Action Insurer Defendants that participated in the Aon-Centered Conspiracy.

214.   Each Defendant has, with their co-conspirators, engaged in continuing illegal contracts, combinations or conspiracies with respect to the sale of Insurance Products in the United States in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

215.   The purpose and effect of Defendants' illegal contracts, combinations or conspiracies was to suppress or eliminate competition, and to raise, maintain or stabilize prices for Insurance Products in the United States at artificially high levels.

216.   The illegal contracts, combinations or conspiracies consisted of agreements among each of the Defendants and their co-conspirators in the respective Conspiracies, the substantial terms of which were to steer business, allocate customers, and rig bids with respect to Insurance Products sold in the United States.

217.   As part of the Conspiracies, Marsh and Aon received kickbacks from the Marsh Insurer Defendants and their co-conspirators, and the Aon Insurer

Defendants and their co-conspirators, respectively, when they placed Insurance Products.

218.    In formulating and effectuating the aforesaid illegal contracts, combinations or conspiracies, each of the Defendants and their co-conspirators in the respective Conspiracies engaged in, among other things, the following conduct:

    a.    steering business and rigging bids with respect to the sale of Insurance Products in the United States;

    b.    creating the "A, B, C" quote system to facilitate and implement their bid-rigging scheme;

    c.    allocating customers to incumbent insurance carriers;

    d.    boycotting customers with respect to the sale of Insurance Products sold in the United States; and

    e.    paying kickbacks to Marsh and/or Aon.

219.    Each of the Defendants and their co-conspirators in the respective Conspiracies engaged in continuing illegal agreements, understandings, and conspiracies in restraint of trade to allocate customers of, steer business for, fix prices of, and rig bids for Insurance Products sold in the United States.

220.    Defendants' acts complained of herein do not constitute the business of insurance regulated under state law.

221.    In formulating and effectuating the illegal contracts, conspiracies or combinations, each of the Defendants and their co-conspirators in

the respective Conspiracies engaged in anti-competitive activities, the purpose and effect of which was to fix prices of, rig bids for, and allocate customers of Insurance Products in the United States.

222.   Marsh and Aon agreed with the Marsh Insurer Defendants and the Aon Insurer Defendants, respectively, to steer business to those who paid the most favorable commissions including under MSAs, PSAs or USAs; to allocate customers; and to rig bids for Insurance Products.

223.   Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the Illegal Scheme.

224.   During and throughout the period of the conspiracies alleged in this Complaint, Plaintiffs purchased Insurance Products from Defendants or their co-conspirators (or the subsidiaries or controlled affiliates of same) at inflated and supra-competitive prices.

225.   In formulating and effectuating the illegal contracts, conspiracies or combinations, each of the Defendants and their co-conspirators in the respective Conspiracies engaged in anticompetitive activities, the purpose and effect of which was to artificially raise, fix, maintain and/or stabilize the price of Insurance Products sold in the United States, including (i) participating in meetings, written exchanges, and/or conversations for the purpose of allocating customers,

steering business, and/or rigging bids with respect to Insurance Products sold in the

United States; (ii) agreeing during those meetings and conversations to allocate

customers, steer business, and/or rig bids for Insurance Products sold in the United

States; and (iii) agreeing during those meetings and conversations to fix the price of

Insurance Products sold in the United States.

226.    As a result of Defendants' Illegal Scheme, Plaintiffs have been

injured in their business and property because they have paid more for Insurance

Products than they would have paid in a competitive market.

227.    The illegal contracts, conspiracies and/or combinations have had

the following effects, among others:

    a.    Price competition in the market for Insurance Products has been
          artificially restrained;

    b.    Prices for Insurance Products sold by the Defendants have been
          raised, fixed, maintained, or stabilized at artificially high and
          non-competitive levels; and

    c.    Purchasers of Insurance Products from the Defendants have
          been deprived of the benefit of free and open competition in the
          markets for Insurance Products.

228.    Defendants have participated in one or more overt acts in

furtherance of the illegal contracts, conspiracies or combinations alleged herein and

have participated in conspiratorial activities described herein.

229.   As a result of this conspiracy, clients purchased Insurance Products at prices higher than they would have paid, and on terms less favorable than would have been available, in a competitive market.

230.   Defendants' acts constitute a *per se* violation of the Sherman Act.  Alternatively, Defendants' acts violate the Sherman Act under a rule of reason analysis.

231.   Various persons, not named as Defendants in this Complaint, participated as co-conspirators, and performed acts and made statements in furtherance of the conspiracies alleged herein.

WHEREFORE, Plaintiffs demand judgment against Broker Defendants and Class Action Insurer Defendants, jointly and severally, as follows:

A.    for damages caused by Defendants' violation of the Sherman Act;

B.    for treble damages;

C.    for Plaintiffs' costs and including attorneys' fees as provided by law;

D.    for such other equitable relief as may be necessary to redress illegal conduct; and

E.    for such other and further relief as may be just and proper.

## COUNT II
### (RICO - 18 U.S.C. §§ 1962(c) and (d) Against Broker Defendants and Class Action Insurer Defendants)

232.    Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 207.

233.    This cause of action is brought under 18 U.S.C. § 1964(c) for violations of 18 U.S.C. §§ 1962(c) & (d).  Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1961(3).

234.    The Insurer Defendants are "persons" as that term is defined by 18 U.S.C. § 1961(3).

235.    Marsh and Global Broking and the individual heads of Global Broking are "persons" as that term is defined by 18 U.S.C. §1961(3).

236.    Aon and the individual heads of Aon are "persons" as that term is defined by 18 U.S.C. §1961(3).

237.    The following persons constitute two groups of persons associated in fact and comprise two Enterprises, as defined in 18 U.S.C. § 1961(4) (the "RICO Enterprises"):

A.    **Marsh Enterprise**

1.    Marsh & McLennan Companies, Inc.;

2.    Marsh Inc.;

3.   Marsh Global Broking Inc.;

4.   ACE Bermuda Insurance Company, Ltd.;

5.   American Alternative Insurance Corporation

6.   Illinois National Insurance Co.;

7.   Lexington Insurance Company;

8.   National Union Fire Insurance Company of Pittsburgh, PA;

9.   ACE American Insurance Company;

10.  Chubb Atlantic Indemnity, Ltd.;

11.  Federal Insurance Company;

12.  Continental Casualty Company;

13.  Twin City Fire Insurance Company;

14.  St. Paul Fire & Marine Insurance Co.;

15.  Travelers Casualty & Surety Company of America;

16.  Travelers Property Casualty Insurance Company;

17.  Gulf Insurance Company;

18.  XL Insurance America, Inc.;

19.  XL Specialty Insurance Company;

20.  Liberty Mutual Insurance Co.;

21.  Royal & Sun Alliance Insurance plc;

22. The Marine Insurance Company Limited;

23. Factory Mutual Insurance Company.;

24. Great American Alliance Insurance Co.;

25. Westchester Surplus Lines Insurance Company; and

26. Endurance Specialty Insurance Ltd;

**B.    Aon Enterprise**

1. Aon Corporation;

2. American International Group, Inc.;

3. Lexington Insurance Company;

4. ACE Bermuda Insurance Ltd.;

5. Chubb & Son, Inc.;

6. CNA Financial Corporation;

7. The Hartford Financial Services Group, Inc.;

8. The Travelers Companies, Inc.;

9. XL America, Inc.;

10. XL Insurance (Bermuda) Ltd.;

11. Liberty Mutual Group;

12. Great American Property Casualty Insurance Group;

13. American International Group, Inc.;

14.    Arch Capital Group;

15.    Arch Capital Group (U.S.) Inc.;

16.    Arch Reinsurance Ltd.;

17.    Endurance Specialty Insurance Ltd;

18.    HCC Insurance Holdings Inc.;

19.    Royal & Sunalliance USA, Inc.;

20.    Max Re Ltd;

21.    Allianz SE;

22.    Fairfax Financial Holdings Limited.;

238.    The enterprise that conducted the Marsh-Centered Conspiracy consisted of Marsh and Global Broking, its executive management, its brokers responsible for the Partner Markets and the Partner Markets themselves, represented by both underwriters and employees who negotiated the new PSAs.

239.    At all relevant times, the Insurer Defendants associated with the Marsh Enterprise (*see* ¶ 237(A)(4)-(26)) (the "Marsh Insurer Defendants") and Marsh and Global Broking (collectively, the "Marsh Enterprise Defendants"), were together an association-in-fact that constituted and still constitutes an "enterprise" engaged in interstate commerce as that term is defined by 18 U.S.C. § 1961(4).

240.   The enterprise that conducted the Aon-Centered Conspiracy consisted of Aon, its executive management, its brokers responsible for the Partner Markets and the Partner Markets themselves, represented by both underwriters and employees who negotiated the new PSAs.

241.   At all relevant times, the Insurer Defendants associated with the Aon Enterprise (*see* ¶ 237 (B)(2)-(22)) (the "Aon Insurer Defendants") and Aon (collectively, the "Aon Enterprise Defendants"), were together an association-in-fact that constituted and still constitutes an "enterprise" engaged in interstate commerce as that term is defined by 18 U.S.C. § 1961(4).

242.   This claim is brought by the following Plaintiffs against the following Defendants:

a.   Marsh clients against Marsh and the Class Action Insurer Defendants that are members of the Marsh Enterprise; and

b.   Aon clients against Aon and the Class Action Insurer Defendants that are members of the Aon Enterprise.

243.   The association-in-fact comprised of the Marsh Enterprise Defendants provides Insurance Products and services to corporate clients, like the Plaintiffs.  Marsh and the Marsh Enterprise Insurer Defendants conducted or participated in the Marsh Enterprise through a pattern of racketeering activity by

controlling the placement of insurance, rigging bids for insurance and improperly inflating their broker commissions and insurance premiums.

244.   The association-in-fact comprised of the Aon Enterprise Defendants provides Insurance Products and services to corporate clients, like the Plaintiffs.  Aon and the Aon Enterprise Defendants conducted or participated in the Aon Enterprise through a pattern of racketeering activity by controlling the placement of insurance, rigging bids for insurance and improperly inflating their broker commissions and insurance premiums.

245.   The March Enterprise and the Aon Enterprise (collectively, the "RICO Enterprises") engaged in activities that affected interstate commerce.

246.   On information and belief, each category of RICO person had a role in the racketeering activity of one of the RICO Enterprises that was distinct from the undertakings of the remaining categories of persons.

247.   On information and belief, each RICO person committed predicate acts of racketeering, though only the combination the actions of all of the persons was sufficient to enable the scheme at issue in this case to succeed.

248.   On information and belief, the various elements of the RICO Enterprises function as continuing units both to conduct the schemes at issue in this

case on as extensive a basis as possible, and in order to earn profits by charging higher broker commissions and higher insurer premiums to Plaintiffs.

249.   On information and belief, the RICO Enterprise had existences separate and apart from the alleged pattern of racketeering activity attributed to each of them.

250.   For example, Global Broking, as the entity in control of the Marsh Enterprise, oversaw and coordinated the commission of the predicate offenses, as well as the other activities of the association-in-fact, on an on-going basis.

251.   Marsh Global Broking wielded this control over the affairs of the association-in-fact by:

    a.    negotiating PSAs with Marsh Enterprise Insurer Defendants to gain higher than normal contingent commission revenue in return for sending more insurance business to these preferred insurers;

    b.    deciding which Marsh Enterprise Insurer Defendant would win the placement of each insurance contract sought by Marsh's clients;

    c.    setting target prices for premiums and enforcing the targets by threatening to move business to other insurers if the insurer did not meet the target;

    d.    selecting Marsh Enterprise Insurer Defendants to submit fictitious "B" quotes for insurance that were intentionally higher in price and/or worse in coverage terms to support Global

Broking's choice of insurer to win the business and designed to make the client believe the insurers were competing when they were not;

e.   concealing the scheme from clients by denying its existence and by failing to disclose the true amount of contingent commission income; and

f.   otherwise having and exercising authority to control the essential activities of the association-in-fact.

252.   While the typical underwriting process can take days or weeks depending on the type of insurance policy and the risk involved, the Marsh Insurer Defendants often responded to requests for "B" quotes within hours or by the next day. They knew they would not win the business and were simply participating in the scheme to concentrate the placement of insurance among a select few companies and increase profits for the enterprise.

253.   When clients did question the premium increases, Global Broking, with the participation of its Marsh Insurer Defendants, presented the client with the fictitious and higher "B" quotes and deceived the client by suggesting that the recommended premium was the best available premium and a result of competition.

254.   This scheme worked only through the combined efforts of the participants in the Marsh Enterprise to set higher premiums and permit Global Broking to control the process without real competition. Only because the Marsh

Insurer Defendants agreed not to compete did they and Marsh enjoy the benefits of ever-increasing premiums, commissions and profits.

255. The normal affairs of Marsh and Aon do not include the direct sale of insurance products to consumers. Those functions are performed exclusively by the Insurer Defendants.

256. The Marsh Insurer Defendants and all other persons participating in the operation of the Marsh Enterprise were throughout the relevant time period, and are now, aware that other participants in the Marsh Enterprise were and are acting to advance the enterprise's scheme, and in particular that such other members were and are advancing the fraudulent scheme to induce Plaintiffs to purchase Insurance Products at inflated prices above the price and/or with worse terms that if insurers had actually competed to win the business.

257. The Aon Insurer Defendants and all other persons participating in the operation of the Aon Enterprise were throughout the relevant time period, and are now, aware that other participants in the Aon Enterprise were and are acting to advance the enterprise's scheme, and in particular that such other members were and are advancing the fraudulent scheme to induce Plaintiffs to purchase Insurance Products at inflated prices above the price and/or with worse terms that if insurers had actually competed to win the business.

258.   Defendants each participated, directly or indirectly, in the conduct of the affairs of the association-in-fact through a pattern of racketeering activity as that term is defined by 18 U.S.C. § 1961(5), and thereby violated 18 U.S.C. § 1962(c).

259.   For example, on information and belief, the mechanism for controlling and directing the affairs of the Marsh Enterprise on an on-going basis was Global Broking's central role as:

a.   designer of the scheme, including specifically that aspect of the scheme calling for broking plans, including "B" quotes when necessary;

b.   preparer of the broking plans, including target prices and terms for the winning insurer's bid;

c.   selector of the winning insurer;

d.   the entity that ensures its clients did not discovery the scheme;

e.   the entity that enforced the scheme by threatening to and in fact moving insurance business to other insurers when Marsh Enterprise Insurer Defendants occasionally failed to meet the target prices.

260.   Defendants' predicate acts, which constitute a pattern of racketeering activity, directly and proximately caused Plaintiffs to pay higher premiums and obtain worse coverage terms, injuring them in their business and property.

261.   Defendants' predicate acts constitute a pattern of racketeering activity because they were related in purpose.

262.   Plaintiffs have been injured in their business or property, as that term is defined by 18 U.S.C. § 1964(c), by reason of the Defendants' racketeering activities.

263.   Each Defendant is a distinct and separate entity from each RICO Enterprise as a whole.

264.   The RICO Enterprises are ongoing organizations engaging in activities that are within the flow of, and substantially affect, interstate commerce.

265.   On information and belief, the Marsh Enterprise Defendants have participated directly in the operation and management of the Marsh Enterprise.

266.   On information and belief, the Aon Enterprise Defendants have participated directly in the operation and management of the Aon Enterprise.

267.   The RICO Enterprises have an existence and structure separate and apart from their constituent members.  The RICO Enterprises have an existence and structure separate and distinct from the pattern of unlawful racketeering activity set out in this Complaint.

268.   On information and belief, the Marsh Enterprise Defendants

have participated in the conduct and operation of the Marsh Enterprise by:

a.   the sharing and dissemination of information among the Marsh
     Insurer Defendants, through Marsh, regarding bids and potential
     bids for Insurance Products to policyholders, including
     Plaintiffs;

b.   coordinating Insurance Product placement strategies among the
     Marsh Enterprise Defendants;

c.   rigging bids or fixing prices for Insurance Products for
     policyholders, including Plaintiffs;

d.   developing the bid-rigging, customer allocation and kickback
     practices described above; and

e.   recommending the purchase of Insurance Products from the
     Marsh Insurer Defendants for the purposes of maximizing
     illegal kickback and suppressing a free market for such
     products.

269.   On information and belief, the Aon Enterprise Defendants have

participated in the conduct and operation of the Aon Enterprise by:

a.   the sharing and dissemination of information among the Aon
     Insurer Defendants, through Aon, regarding bids and potential
     bids for Insurance Products to policyholders, including
     Plaintiffs;

b.   coordinating Insurance Product placement strategies among the
     Aon Enterprise Defendants;

c.   rigging bids or fixing prices for Insurance Products for
     policyholders, including Plaintiffs;

d.    developing the bid-rigging, customer allocation and kickback practices described above; and

e.    recommending the purchase of Insurance Products from the Aon Insurer Defendants for the purposes of maximizing illegal kickback and suppressing a free market for such products.

270.    Defendants conducted the activities of and operated the aforementioned RICO Enterprises through predicate acts of mail and wire fraud that violated 18 U.S.C. §§ 1341 and 1343.

271.    On information and belief, Defendants knew or recklessly disregarded that the misrepresentations or omissions described above were material, and Plaintiffs relied on them in buying Insurance Products.

272.    As a result, Plaintiffs have been injured in their business or property by the Defendants' overt acts of mail and wire fraud and by their aiding and abetting others in the commission of such acts. Specifically, Defendants have committed predicate acts as alleged in paragraphs 129, 138-40, 142-43, 146-49, 163, 166, 196, 201-02, and 206 above.

273.    On information and belief, Defendants have committed a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5) by committing, aiding and abetting, or agreeing to further the commission of thousands of acts of racketeering activity (violations of 18 U.S.C. §§ 1341, 1343) as described above.

274. On information and belief, each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including Plaintiffs.

275. On information and belief, Defendants have knowingly and willfully participated in an Illegal Scheme to defraud Plaintiffs through the RICO Enterprises by engaging in conduct violative of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

276. On information and belief, Defendants have participated in the Illegal Scheme with the specific intent to defraud Plaintiffs.

277. On information and belief, to effectuate their Illegal Scheme, Defendants have placed in post offices and/or official depositories of the United States Postal Service things to be delivered by the Postal Service; caused things to be delivered by commercial interstate carriers; and received things from the Postal Service or commercial interstate carriers, including, but not limited to, agreements and correspondence relating to Insurance Products offered for sale to Plaintiffs.

278. On information and belief, to effectuate the RICO Enterprises, Defendants have transmitted and received by wire, matters and things including, but

not limited to, agreements, communications, correspondence and payments relating to Insurance Products offered for sale to Plaintiffs.

279.   Defendants' illegal activities have had the following effects:

a.      Plaintiffs have paid more for Insurance Products than they would have paid in a competitive market unfettered by the RICO Enterprises;

b.      price competition in the sale of Insurance Products was restrained, suppressed and eliminated in the United States; and

c.      as a direct and proximate result of the RICO Enterprises, Plaintiffs have been injured and financially damaged in their business and property, including by paying inflated insurance premiums and commissions and obtaining coverage that lacked the desired terms and limits.

280.   Each of Defendants' acts of racketeering activity was related and had a similar purpose, involving similar participants and methods of commission, and impacted similar victims, including Plaintiffs.

281.   Defendants' agreement to participate in the unlawful operation of or the other of the RICO Enterprises to increase commissions and premiums, allocate customers, and to rig bids is a violation of 18 U.S.C. § 1962(d).

282.   As a direct result, Plaintiffs have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Plaintiffs paid excessive premiums for Insurance Products that they purchased and

that were inferior to those that would have been made available to them absent the Illegal Scheme described herein.

283.   Defendants are therefore liable for treble damages as proven and costs and attorneys' fees.

WHEREFORE, Plaintiffs demand judgment against the Broker Defendants and Class Action Insurer Defendants, jointly and severally, as follows:

A.    for damages caused by Defendants' violation of 18 U.S.C. § 1962 (c);

B.    for damages caused by Defendants' violation of 18 U.S.C. § 1962 (d);

C.    for treble damages;

D.    for Plaintiffs' costs and including attorneys' fees as provided by law;

E.    for such other equitable relief as may be necessary to redress illegal conduct; and

F.    for such other and further relief as may be just and proper.

## COUNT III
### (Breach of Fiduciary Duty Against Marsh and Aon)

284.   Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 207.

285.   This claim is brought by Plaintiffs against the Broker
Defendants.

286.   Marsh cited its size and sophistication as a primary reason to
hire the company.  Marsh held itself out to its clients, including Plaintiffs, as a
trusted expert in the analysis and placement of Insurance Products.  Marsh also
assured its clients, including Plaintiffs, that its "guiding principal is to consider our
client's best interest in all placements."  Marsh represented to its clients, including
Plaintiffs, that "We are our clients' advocates, and we represent them in
negotiations.  We don't represent the [insurance companies]."

287.   Aon likewise held itself out to its clients, including Plaintiffs, as
a trusted expert in the analysis and placement of Insurance Products.

288.   The Broker Defendants knowingly and willingly assumed a
fiduciary responsibility to their clients, including Plaintiffs.  As brokers for
Plaintiffs, the Broker Defendants acted as representatives, agents and fiduciaries.
Plaintiffs reasonably relied on the Broker Defendants to inform them of the best
possible competitively-determined price for (a) the Insurance Products Plaintiffs
sought to purchase; (b) any compensation the Broker Defendants would receive for
their services; and (c) any expenses Plaintiffs would incur in purchasing Insurance
Products.

289.   The Broker Defendants were in a confidential fiduciary relationship with Plaintiffs and owed Plaintiffs the highest duties of due care, loyalty, honesty, and good faith and fair dealing.  The Broker Defendants were obligated to refrain from favoring their own interests or those of their co-conspirators at the expense, and to the detriment, of Plaintiffs.

290.   Plaintiffs placed trust and confidence in the Broker Defendants to deal fairly and employ due diligence in obtaining Insurance Products for Plaintiffs.  Federal and/or state common law required the Broker Defendants to deal fairly with Plaintiffs in the procurement of Insurance Products.

291.   Plaintiffs had a legal and reasonable expectation that the Broker Defendants would not place their own financial gain above the interests of Plaintiffs.

292.   As brokers for Plaintiffs, acting as their representatives, agents and fiduciaries, the Broker Defendants had a duty to disclose material facts to Plaintiffs that were relevant to the parties' relationships.  The Broker Defendants were obligated to disclose fully to Plaintiffs the existence of bid rigging schemes, kickbacks, so-called contingent fees, or other payments made by insurance companies that were material facts relating to and affecting the subject matter of the parties' relationships and the procurement of Insurance Products.

293.   As brokers for Plaintiffs, acting as the representative, agent and fiduciary for each Plaintiff, the Broker Defendants had a duty to remit to Plaintiffs any undisclosed profit the Broker Defendants collected in connection with or because of the procurement of Insurance Products on behalf of Plaintiffs.

294.   The Broker Defendants violated the trust of their clients, including Plaintiffs. The Broker Defendants did not consider the best interests of their clients, including Plaintiffs, in all placements of Insurance Products. The Broker Defendants did not act as the disinterested advocate of their clients, including Plaintiffs, in their brokerage and/or placement of Insurance Products.

295.   The Broker Defendants breached their fiduciary duties to Plaintiffs, including the duties of good faith, loyalty and trust, the duty to disclose material facts and the duty to remit undisclosed profits by, *inter alia*:

a.   entering into undisclosed agreements with insurance companies, including the Insurer Defendants, for kickbacks, contingent fees or other payments, thereby knowingly creating an obvious conflict of interest;

b.   secretly profiting at the expense of Plaintiffs;

c.   failing to disclose to Plaintiffs the existence of the kickbacks, contingent fees and agreements with insurance companies, including the Insurer Defendants;

d.   failing to remit to Plaintiffs the undisclosed profits collected in connection with or because of the procurement of Insurance Products on behalf of Plaintiffs; and

    e.     facilitating Plaintiffs' procurement of more expensive Insurance Products and services than Plaintiffs could have procured in a competitive market through the implementation of the Illegal Scheme, while secretly profiting from such arrangement.

296.   As a direct and proximate result of the Broker Defendants' wrongful conduct, Plaintiffs have suffered damages.

297.   By virtue of the foregoing, Plaintiffs should be awarded damages in an amount to be determined at trial.

298.   As a result of the breach of fiduciary duties owed to them by the Broker Defendants, Plaintiffs are entitled to the disgorgement of all profits or benefits improperly received by the Broker Defendants via contingent fees and related payments by insurance companies.

299.   Defendants' conduct was intentional, willful, wanton, and specifically intended to cause harm to Plaintiffs, and justifies an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against each of the Broker Defendants, jointly and severally, as follows:

    A.     directing that the Broker Defendants disgorge to Plaintiffs all fees collected from any source whatsoever;

B.    directing that the Broker Defendants pay all restitution, and damages directly or indirectly caused by the breaches of the fiduciary duties complained of herein;

C.    directing that the Broker Defendants pay Plaintiffs' costs, and attorneys' fees as provided by law;

D.    awarding punitive damages against the Broker Defendants;

E.    directing such other equitable relief as may be necessary to redress illegal conduct; and

F.    granting such other and further relief as may be just and proper.

## COUNT IV
### (Inducement to Breach Fiduciary Duty Against Insurer Defendants)

300.    Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 207.

301.    This claim is brought by Plaintiffs against the Insurer Defendants.

302.    As alleged above, a fiduciary relationship existed between each Broker Defendant and each of its clients, including Plaintiffs.

303.    The Broker Defendants breached these fiduciary duties as alleged herein, including in Count III, above.

304.   The Insurer Defendants knowingly participated in and/or induced such breaches by, among other things, engaging in the conspiratorial conduct alleged herein.

305.   Plaintiffs have suffered damages proximately caused by the Insurer Defendants' participation in and inducement of the Broker Defendants' breaches of fiduciary duties to Plaintiffs.

306.   The Insurer Defendants' conduct was intentional, willful, wanton and justifies an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against the Insurer Defendants, jointly and severally, as follows:

A.      directing that the Insurer Defendants disgorge all profits obtained, including fees collected, from Plaintiffs on account of Plaintiffs' business, all policyholder premiums collected on account of Plaintiffs' business, and pay all restitution, and damages directly or indirectly caused by the participation in and inducement of the Broker Defendants' breaches of fiduciary duties complained of herein;

B.      directing that the Insurer Defendants pay Plaintiffs' costs and attorneys' fees as provided by law;

C.      awarding punitive damages against the Insurer Defendants;

D.    directing such other equitable relief as may be necessary to redress illegal conduct; and

E.    granting such other and further relief as may be just and proper.

## COUNT V
### (Breach of Contract Against Broker Defendants)

307.   Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 207.

308.   This claim is brought by Plaintiffs against the Broker Defendants.

309.   Plaintiffs that were clients of Marsh (the "Marsh Plaintiffs") each had a valid and enforceable agreement with Marsh.

310.   For each such Marsh Plaintiff, Marsh agreed to solicit and obtain competitive bids on the client's needs for Insurance Products, and to provide a competitive bid to the client for the Insurance Products that it sought to purchase, in return for the client's agreement to pay Marsh for this service.

311.   Plaintiffs that were clients of Aon (the "Aon Plaintiffs") each had a valid and enforceable agreement with Aon.

312.   For each such Aon Plaintiff, Aon agreed to solicit and obtain competitive bids on the client's needs for Insurance Products, and to provide a

competitive bid to the client for the Insurance Products that it sought to purchase, in return for the client's agreement to pay Aon for this service.

313.    The Marsh Plaintiffs fully paid Marsh for these services.

314.    The Aon Plaintiffs fully paid Aon for these services.

315.    Marsh breached its agreements with the Marsh Plaintiffs because Marsh did not solicit, obtain and then provide to its clients genuinely competitive bids for its clients' Insurance Products.  Instead, Marsh entered into the Marsh-Centered Conspiracy alleged herein, which eliminated competition in bids for the sale of Insurance Products.

316.    Likewise, Aon breached its agreements with the Aon Plaintiffs because Aon did not solicit, obtain and then provide to its clients genuinely competitive bids for its clients' Insurance Products.  Instead, Aon entered into the Aon-Centered Conspiracy alleged herein, which eliminated competition in bids for the sale of Insurance Products.

317.    The Marsh Plaintiffs have suffered damages as a result of Marsh's breaches of its agreements with them.

318.    The Aon Plaintiffs have suffered damages as a result of Aon's breaches of its agreements with them.

WHEREFORE, Plaintiffs demand judgment against the Marsh and Aon as follows:

A.    awarding damages to the Marsh Plaintiffs against Marsh in an amount to be determined at trial, plus attorneys fees, costs and interest;

B.    awarding damages to the Aon Plaintiffs against Aon in an amount to be determined at trial, plus attorneys fees, costs and interest; and

C.    granting such other and further relief as may be just and proper.

## COUNT VI
### (Tortious Interference with Contract Against Insurer Defendants)

319.   Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 207.

320.   This claim is brought by Plaintiffs against the Insurer Defendants.

321.   The Marsh Plaintiffs each had a valid and enforceable agreement with Marsh.

322.   The Aon Plaintiffs each had a valid and enforceable agreement with Aon.

323.   The Marsh Insurer Defendants were aware that the Marsh Plaintiffs each had a valid and enforceable agreement with Marsh.

324.   The Aon Insurer Defendants were aware that the Aon Plaintiffs each had a valid and enforceable agreement with Aon.

325.   The Marsh Insurer Defendants intentionally and unjustifiably induced Marsh to breach each of its agreements with the Marsh Plaintiffs.

326.   The Aon Insurer Defendants intentionally and unjustifiably induced Aon to breach each of its agreements with the Aon Plaintiffs.

327.   Marsh breached each of its agreements with the Marsh Plaintiffs as a result of the Marsh Insurer Defendants' wrongful conduct, as alleged herein.

328.   Aon breached each of its agreements with the Aon Plaintiffs as a result of the Aon Insurer Defendants' wrongful conduct, as alleged herein.

329.   The Marsh Plaintiffs have suffered damages as a result of the Marsh Insurer Defendants' wrongful conduct, as alleged herein.

330.   The Aon Plaintiffs have suffered damages as a result of the Aon Insurer Defendants' wrongful conduct, as alleged herein.

WHEREFORE, Plaintiffs demand judgment against Marsh and Aon, jointly and severally, as follows:

A.     awarding damages to the Marsh Plaintiffs against Marsh for injuries sustained as a result of the Marsh Insurer Defendants' wrongful conduct, plus attorneys fees, costs and interest;

B.    awarding damages to the Aon Plaintiffs against Aon for injuries sustained as a result of the Aon Insurer Defendants' wrongful conduct, plus attorneys fees, costs and interest;

C.    awarding the Marsh Plaintiffs and the Aon Plaintiffs punitive damages in an amount to be determined at trial;

D.    granting such other and further relief as may be just and proper.

## COUNT VII
### (Unjust Enrichment Against All Defendants)

331.    Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 207.

332.    Plaintiffs conferred a financial benefit upon the Broker Defendants as a result of Plaintiffs' purchases Insurance Products from the Broker Defendants. This benefit not only consisted of the fees that they paid to the Broker Defendants for their services, but also the additional contingent fees and other profits that the Broker Defendants were able to receive (a) from the Insurer Defendants with which the Broker Defendants had contingent fee agreements; and (b) from the Illegal Scheme the Broker Defendants engaged in, as set forth above.

333.    Plaintiffs conferred a financial benefit upon the Insurer Defendants as a result of their purchasing of the Insurer Defendants' Insurance Products. This benefit not only consists of the premiums they paid to the Insurer

Defendants for their Insurance Products, but also consists of inflated premiums over and above those Plaintiffs would have paid, and on terms less favorable than would have been available, in a competitive market.

334.   The Broker Defendants have been financially enriched by the brokerage fees received from Plaintiffs and by the contingent fees and kickbacks received from the Insurer Defendants for providing those carriers' Insurance Products to Plaintiffs.

335.   The Insurer Defendants have been financially enriched by the excessive premiums received from Plaintiffs.

336.   Defendants obtained this financial enrichment to the detriment and at the expense of Plaintiffs.  As a result of the Defendants' Illegal Scheme, Plaintiffs paid more for Insurance Products than they would have had to pay absent the Illegal Scheme and/or received fewer and/or inappropriate Insurance Products than they would have received absent the Illegal Scheme.

337.   It would offend equity and good conscience to allow Defendants to retain the payments and proceeds that they derived and received, indirectly or directly, from the Illegal Scheme described in this Complaint.  By engaging in the acts and conduct described above, Defendants unjustly enriched themselves and

deprived policyholders, including Plaintiffs, of a fair marketplace for Insurance Products.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, as follows:

A.    directing that Defendants disgorge all profits obtained, including fees collected, and pay all restitution, and damages caused, directly or indirectly, by the wrongful acts complained of herein;

B.    directing such other equitable relief as may be necessary to redress wrongful conduct; and

C.    granting such other and further relief as may be just and proper.

## COUNT VIII
### (Common Law Fraud Against the Broker Defendants)

338.    Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 207.

339.    The Broker Defendants had a duty to fully disclose to Plaintiffs the facts concerning the services provided by the Broker Defendants to their clients, including Plaintiffs.

340.    In fact, the Broker Defendants concealed and omitted material facts concerning their participation in the Illegal Scheme.

341.  In addition, the Broker Defendants affirmatively misrepresented material facts concerning their conduct.

342.  Among other things, by engaging in the aforementioned acts and practices, the Broker Defendants falsely represented or omitted stating that:

a.  the Broker Defendants were securing the best coverage for Plaintiffs at the best price when, in fact, they did not;

b.  the Broker Defendants would act in the best interests of Plaintiffs when, in fact, they did not;

c.  the Broker Defendants would be remunerated solely for their services, either through a flat fee paid by the client or disclosed commissions paid by the Insurer Defendants when, in fact, they received additional, undisclosed compensation from other sources;

d.  the brokerage commissions would be only the amount disclosed when, in fact, they were not;

e.  the Broker Defendants would act as a fiduciary solely for the interests of their clients, including the Plaintiffs, when, in fact, they did not;

f.  the Insurer Defendants had been recommended to Plaintiffs based solely on the policies they offered when, in fact, they had not been; and

g.  plaintiffs would receive a competitively-determined price for an array of Insurance Products when, in fact, the bidding had been rigged.

343.  The Broker Defendants' silence in failing to inform Plaintiffs of the material omissions and misrepresentations of facts were intended by the Broker

Defendants to induce, and did in fact induce, Plaintiffs to reasonably and detrimentally rely on the material omissions and misrepresentations of material facts.

344.   The Broker Defendants knew that their false communications and material omissions would induce reliance by Plaintiffs.

345.   Plaintiffs reasonably and justifiably relied on the misrepresentations and omissions of the Broker Defendants.  Had Plaintiffs known of the Broker Defendants' illegal conduct and the misrepresentations and omissions, they would not have purchased their Insurance Products through the Broker Defendants.

346.   Such reliance was to the detriment of Plaintiffs and proximately caused damage to Plaintiffs.

347.   The acts and practices of the Broker Defendants alleged herein constitute actual and/or constructive fraud under state common law, including the common law of the State of Georgia.

348.   Defendants' conduct was intentional, willful, wanton, and specifically intended to cause harm to Plaintiffs, and justifies an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against the Broker Defendants, jointly and severally, as follows:

A.    awarding damages against the Broker Defendants;

B.    awarding punitive damages against the Broker Defendants;

C.    directing such other equitable relief as may be necessary to redress wrongful conduct complained of herein; and

D.    granting such other and further relief as may be just and proper.

## COUNT IX
### (Aiding and Abetting Common Law Fraud Against Insurer Defendants)

349.    Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 207.

350.    This claim is brought by Plaintiffs against the Insurer Defendants.

351.    As alleged above, the Broker Defendants defrauded their clients, including Plaintiffs, by, *inter alia*, concealing and omitting material facts concerning their participation in the Illegal Scheme.

352.    The Insurer Defendants knowingly participated in and/or induced these fraudulent acts by, among other things, engaging in the conspiratorial conduct alleged in this Complaint.

353.   The Insurer Defendants provided substantial assistance to the Broker Defendants to advance the commission of these fraudulent acts by, among other things, engaging in the conspiratorial conduct described above.

354.   Plaintiffs have suffered damages proximately caused by the Insurer Defendants' knowledge of and substantial assistance in advancing the fraudulent acts of the Broker Defendants alleged herein.

355.   The Insurer Defendants' conduct was intentional, willful, wanton and justifies an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against the Insurer Defendants, jointly and severally, as follows:

A.    awarding damages against the Insurer Defendants;

B.    awarding punitive damages against the Insurer Defendants;

C.    directing such other equitable relief as may be necessary to redress wrongful conduct complained of herein; and

D.    granting such other and further relief as may be just and proper.

## COUNT X
### (Statutory and Consumer Fraud Against All Defendants)

356.   Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 207.

357.   The Broker Defendants are providers of insurance brokerage services.

358.   The Insurer Defendants are providers of Insurance Products.

359.   Plaintiffs are consumers of Insurance Products and insurance brokerage services.

360.   Among other things, by engaging in the aforementioned acts and practices, the Broker Defendants falsely represented or omitted to state the following:

   a.   the Broker Defendants were securing the best coverage for Plaintiffs at the best price when, in fact, they were not;

   b.   the Broker Defendants would act in the best interests of Plaintiffs when, in fact, they would not and did not;

   c.   the Broker Defendants would be remunerated solely for their services to the Plaintiffs, either through a flat fee paid by the client or disclosed commissions paid by the Insurer Defendants when, in fact, they received additional, undisclosed kickbacks or other illegal compensation from other sources;

   d.   the brokerage commissions would be only the amounts disclosed when, in fact, they were not;

   e.   the Broker Defendants would act as fiduciaries solely for the Plaintiffs' interests when, in fact, they would and did not;

   f.   the Insurer Defendants had been recommended to Plaintiffs by the Broker Defendants based on  the terms of policies and pricing; however, neither the Broker Defendants, nor the Insurer

Defendants disclosed to the Plaintiffs the existence of the Illegal Scheme.

361.    The Insurer Defendants had actual or constructive knowledge that the Broker Defendants were representing to Plaintiffs that the bids, quotes, and terms of insurance related to the Insurance Products provided by the Insurer Defendants were in fact legitimate and not the product of the illegal and wrongful acts described above.

362.    The Insurer Defendants knowingly facilitated the misrepresentations and omissions by the Broker Defendants concerning the Insurance Products provided by the Insurer Defendants to Plaintiffs.

363.    Defendants' acts and practices, as alleged herein, constitute material misrepresentations and omissions.

364.    These misrepresentations and omissions were negligent.

365.    These misrepresentations and omissions were intentional.

366.    Plaintiffs reasonably, justifiably and detrimentally relied on Defendants' misrepresentations and omissions.

367.    These acts proximately caused damages to Plaintiffs.

368.    Defendants' acts and practices, as alleged herein, are immoral, unethical, oppressive, unscrupulous and have caused substantial injury.

369.  Defendants' acts or practices constitute consumer fraud or deceptive acts or practices in violation of state consumer fraud statutes, including the Georgia Unfair and Deceptive Trade Practices Act, O.C.G.A. §§ 10-1-370 to 10-1-375.

370.  The conduct described herein entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, as follows:

A.    enjoining and restraining Defendants, their affiliates, assignees, subsidiaries, successors and transferees, officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from engaging in any conduct, conspiracy, contract, agreement, arrangement or combination, and from adopting or following any practice, plan, program, scheme, artifice or device similar to, or having a purpose and effect similar to, the conduct complained of above;

B.    awarding Plaintiffs damages to the extent damages are available under state consumer fraud statutes caused, directly or indirectly, by the fraudulent and deceptive acts complained of herein;

C.    directing that Defendants pay Plaintiffs' costs and attorneys' fees as provided by law;

D.    awarding punitive damages against Defendants;

E.    awarding treble damages to Plaintiffs;

F.    directing such other equitable relief as may be necessary to redress illegal conduct; and

G.    granting such other and further relief as may be just and proper.

## COUNT XI
### (Violation of State Antitrust Laws Against All Defendants)

371.    Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 207.

372.    On information and belief, Defendants and their co-conspirators engaged in continuing illegal contracts, combinations or conspiracies with respect to the sale of Insurance Products in the United States in an unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged herein including in Count I herein.

373.    Such conduct constitutes an unlawful restraint in violation of state antitrust statutes, including those of the State of Georgia, Georgia Code Ann. §§16-10-22 *et seq.*, and §§13-8-2 *et seq.*

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, as follows:

      A.     for damages caused by Defendants' violation of state antitrust laws;

      B.     for treble damages;

      C.     for Plaintiffs' costs and including attorneys' fees as provided by law;

      D.     for such other equitable relief as may be necessary to redress illegal conduct; and

      E.     for such other and further relief as may be just and proper.

## SUSPENSION OF THE STATUTES OF LIMITATION – FRAUDULENT CONCEALMENT

374.   Defendants engaged in successful, illegal, price-fixing, bid-rigging and customer allocation conspiracies that, by their nature, were inherently self-concealing.

375.   Since the inherently self-concealing contracts, combinations or conspiracies were kept secret by Defendants, Plaintiffs were unaware of the anti-competitive agreements.

376.   Plaintiffs had no knowledge of Defendants' unlawful self-concealing conspiracies prior to the announcement by the Attorney General of the State of New York on October 14, 2004.

377.   The illegal contracts, conspiracies, or combinations were fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, minimization of written records, failure to disclose bid-rigging, price-fixing and customer allocations to clients and surreptitious communications between the Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records.  In addition, certain of the Broker Defendants' former employees have admitted that they engaged in deception to hide the existence, nature, and effect of the Illegal Scheme.

378.   Marsh's policy of misleading clients about the payment and receipt of Contingent Commissions came to light in the guilty plea of a former Marsh managing director, Joshua M. Bewlay, who pled guilty to a felony charge of scheming to defraud on February 14, 2005.  Mr. Bewlay's testimony revealed that Marsh established a procedure or a "protocol" intended to "discourage the client from obtaining an answer" about how Marsh received compensation from insurance companies.  Mr. Bewlay's testimony states the following, in relevant part:

Finally, during my employment, I was made aware of a Marsh protocol designed to prevent Marsh's clients form obtaining accurate information concerning the amount of placement service or PSA or MSA revenue Marsh earned from carriers with respect to a particular client in addition to any fee or commission paid. ***The protocol required multiple layers of inquiry to discourage the client from obtaining an answer.*** Also that all inquiries be channeled through a single Marsh employee who directed the answer to the inquiry. (emphasis added)

Finally, the percentage or ratio that Marsh used when it responded to a client's inquiry concerning placement service or PSA or MSA revenue significantly understated the amount of PSA or MSA revenue earned with respect to a particular client. In my department, Global Brokerage and Excess Casualty significantly understated the amount of PSA or MSA revenue earned by Marsh with respect to a particular client.

When I was told that a client inquired as to the amount of PSA revenue Marsh earned from an insurance carrier, I responded that the Marsh employee follow Marsh's protocol, including that the client only speak to the Marsh employee designated to respond to such inquiries.

379.    Mr. Bewlay similarly admitted in his plea agreement that he made misleading statements about the amount of compensation Marsh received from insurers. Mr. Bewlay's plea agreement states, in relevant part:

From in and before 1999 through 2004, Mr. Bewlay engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons and to obtain property, namely insurance premiums, commissions and fees, from ten or more persons, to wit, clients of Marsh, by false and fraudulent pretenses, representations and promises, to wit, misleading statements about the amount of compensation Marsh derived from insurance carriers, and so obtained property form one or more such person, in that ***Mr. Bewlay referred client inquiries for disclosure of such compensation***

*to a designated Marsh employee, knowing that said employee would provide misleading information concerning Marsh's compensation to the clients.* (emphasis added)

380.   On information and belief, Defendants fraudulently concealed their illegal contracts, conspiracies or combinations in other ways as well.   For example, Broker Defendants falsely represented to their clients that price increases for Insurance Products were arrived at competitively when, in fact, these price increases were the direct result of collusive activity among Defendants.   The Broker Defendants also disseminated false and misleading information concerning their use of MSAs, PSAs, and USAs.   The Insurer Defendants understood that the Broker Defendants were making misleading and false representations to the policyholders concerning the illicit kickback payments.

381.   Plaintiffs could not have discovered the illegal contracts, conspiracies or combinations at an earlier date by the exercise of reasonable diligence because of the deceptive practices, fraudulent concealment, and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of their Illegal Scheme.

WHEREFORE, for the foregoing reasons, Plaintiffs request a finding that because of Defendants' fraudulent concealment, the running of any statute of

limitations has been tolled and suspended with respect to any claims that Plaintiffs

have as a result of the Defendants' conduct as alleged in this Complaint.

## JURY TRIAL DEMANDED

Plaintiffs respectfully demand a trial by jury of all issues so triable.


Dated:  October 12, 2007                    Respectfully submitted,

By:

Jeffrey D. Horst
Georgia Bar No. 367834
Horst@khlawfirm.com
David A. Sirna
Georgia Bar No. 613513
Sirna@khlawfirm.com
KREVOLIN & HORST, LLC
1175 Peachtree Street, N.E.
Suite 2150, 100 Colony Square
Atlanta, Georgia 30361
(404) 888-9594
(404) 888-9577 (facsimile)

Of Counsel:

William G. Schopf
Patrick J. Heneghan
Ian H. Fisher
SCHOPF & WEISS LLP
One South Wacker Drive, 28th Floor
Chicago, IL 60606
Telephone: 312.701.9300
Facsimile:  312.701.9335

*ROEBUCK & CO., SEARS HOLDINGS CORPORATION, KMART CORPORATION AND LANDS' END, INC.*